James Scott BRADY, Timothy John McCarthy, and Thomas K. Delahanty, Plaintiffs,

v.

John J. HOPPER, Jr., M.D., Defendant.

Civ. A. No. 83–JM–451.

United States District Court, D. Colorado.

Sept. 14, 1983.

Jacob A. Stein, Stein, Mitchell & Mazines, Robert Cadeaux, Washington, D.C., Daniel J. Popeo, Paul D. Kamenar, Nicholas E. Calio, Washington Legal Foundation, Washington, D.C., Charles F. Brega, Robert E. Kendig, Roath & Brega, Denver, Colo., for plaintiffs.

Joseph C. Jaudon, Michael T. McConnell, Long & Jaudon, P.C., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

JOHN P. MOORE, District Judge.

This matter comes before the Court on defendant's motion to dismiss. Consequently, the well-pleaded allegations of fact must be accepted as true, and the facts must be construed in a light most favorable to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973); *Oppenheim v. Sterling,* 368 F.2d 516 (10th Cir.1966), *cert. denied* 386 U.S. 1011, 87 S.Ct. 1357, 18 L.Ed.2d 441 (1967). Moreover, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Dewell v. Lawson,* 489 F.2d 877 (10th Cir.1974); *Davidson v. Dill,* 180 Colo. 123, 503 P.2d 157 (1972).

## I.

### *Allegations of the Complaint*

Plaintiffs James Scott Brady, Timothy John McCarthy, and Thomas K. Delahanty were all shot and seriously injured by John W. Hinckley, Jr. ("Hinckley") in his attempt to assassinate President Reagan on March 30, 1981, in Washington, D.C. The defendant, Dr. John J. Hopper, Jr., is the psychiatrist who had been treating Hinckley from late October, 1980, until March, 1981.

Plaintiffs' complaint alleges that Dr. Hopper was negligent in examining, diagnosing, and treating Hinckley in conformity with reasonable standards of psychiatric care. According to the complaint, Hinckley was brought to Dr. Hopper in late October, 1980, by Hinckley's parents because the parents were concerned about their son's behavior, including a purported suicide attempt by drug overdose. Plaintiffs allege despite Hinckley's attempted suicide on at least one if not several occasions, Dr. Hopper negligently formed the opinion that Hinckley was not seriously ill. (Complaint ¶ 15). Dr. Hopper proceeded to treat Hinckley and prescribed valium and biofeedback therapy. Dr. Hopper also recommended to Hinckley's parents that Hinckley be on his own by the end of March, 1981. Plaintiffs assert that Dr. Hopper's treatment was not only ineffective, but that it actually aggravated Hinckley's mental condition, and made him more aggressive and dangerous, thereby creating an unreasonable risk of harm to others. (Complaint ¶¶ 16–29).

The complaint alleges that Dr. Hopper knew or should have known that Hinckley was a danger to himself or others, and that Dr. Hopper either possessed or had access to, information which would have indicated that Hinckley identified with the assassin in the movie "Taxi Driver"; that he was collecting books and articles on political assassination; and that Hinckley possessed guns and ammunition. (Complaint ¶ 28). According to the complaint, Hinckley's parents were aware of and concerned about their son's worsening condition, and contacted Dr. Hopper and recommended that their

son be hospitalized. (Complaint ¶¶ 13–17). Despite the possibility Hinckley might have been amenable to that idea, Dr. Hopper recommended that Hinckley not be hospitalized, and that treatment continue on an outpatient basis. (Complaint ¶ 18).

The rest of Hinckley's strange story is well known. In March, 1981, Hinckley left Denver and traveled across the country to Washington, D.C. On March 30, 1981, he attempted to assassinate President Reagan, and, in the process, shot and injured plaintiffs. Hinckley was subsequently tried for these crimes and found not guilty by reason of insanity. He is currently confined to St. Elizabeth's Hospital where he is receiving medical and psychiatric care.

The gravamen of plaintiffs' complaint is that if Dr. Hopper had properly performed his professional duties, he would have controlled Hinckley's behavior; therefore, Hinckley would not have made the presidential assassination attempt. Specifically, plaintiffs assert that the prescription of valium and biofeedback therapy, coupled with the advice that Hinckley's parents "cut him off", aggravated Hinckley's condition and actually contributed to his dangerous propensity. Further, plaintiffs assert that Dr. Hopper should have consulted with another psychiatrist regarding his form of treatment, and that Dr. Hopper should have taken steps to have Hinckley confined. Finally, plaintiffs allege that Dr. Hopper should have warned Hinckley's parents of their son's extremely dangerous condition, and that he should have warned law enforcement officials of Hinckley's potential for political assassination. (Complaint ¶¶ 22–28).

## II.

### Summary of the Arguments

The primary issue raised by defendant's motion is whether the relationship between therapist and patient gives rise to a legal duty such that Dr. Hopper can be held liable for the injuries caused to plaintiffs by Hinckley. The Restatement (Second) of Torts § 315 states as follows:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

The thrust of defendant's argument is that the relationship between Dr. Hopper and Hinckley, that of a therapist and outpatient, is not a "special relationship" which gives rise to a duty on the part of the therapist to control the actions of the patient. In other words, defendant asserts that the therapist-outpatient relationship lacks sufficient elements of control required to bring the therapist within the language of § 315.

The main case upon which defendant relies in support of this position is *Hasenei v. United States,* 541 F.Supp. 999 (D.Md.1982). *Hasenei* was an action under the Federal Tort Claims Act for injuries sustained when plaintiffs' car collided head-on with a car driven by an army veteran who had been treated as an outpatient at a VA hospital. Plaintiffs in that case argued that the treating psychiatrist was negligent in his diagnosis and treatment of the patient, and that the doctor's negligence caused the plaintiff's injuries. After trial to the court, the court found that under the facts of that case, "there seemingly was no way in which [the psychiatrist] could have predicted with any reasonable degree of medical or psychiatric certainty that within 12 days or one month [the patient] would do harm to himself or others." *Id.* at 1011. The court went on to hold that the relationship which existed between the psychiatrist and patient did not give the psychiatrist the right or ability to control the patient's conduct, and in the absence of such a relationship, the psychiatrist owed no duty to plaintiff to control the patient's activities, and therefore the psychiatrist could not be held liable. This idea was also expressed in *Megeff*

*v. Doland,* 123 Cal.App.3d 251, 176 Cal.Rptr. 467 (1981), "It is fundamental that in order to take charge of a person in such a manner as will create a duty to control his conduct, one must possess the ability to control that person's conduct."

Defendant next argues that the duty to control the violent acts of another does not arise absent specific threats directed to a reasonably identifiable victim. The leading case on a therapist's liability for the violent actions of a patient is *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In *Tarasoff,* the patient communicated to the therapist specific threats and his intention to kill an unnamed—although readily identifiable—girl. The therapist informed law enforcement authorities of these threats, but failed to warn the girl or her parents. The California Supreme Court held that when a therapist determines (or pursuant to the standards of his profession should determine) that his patient presents a serious danger of violence to another, he is then obligated to take reasonable care to protect the intended victim against such danger. The court further held in such cases reasonable care may include the duty to warn the intended victim.

In *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980), the California Supreme Court again faced the question of the extent of liability to a third party for the dangerous acts of another. In *Thompson,* a juvenile offender known to have dangerous propensities was confined in a county institution. This patient had made generalized threats regarding his intention to kill, but had made no specific threats regarding any identifiable person. The county institution released the patient on temporary leave, and, within a

day, the patient killed a young boy in his neighborhood. The court refused to extend *Tarasoff* to a setting where there was no identifiable victim. Instead, it took a more limited approach to the duty to warn, and concluded that even in the case of a person with a history of violence, no duty existed when the person had made only nonspecific threats of harm directed at nonspecific victims. *Id.* at 614 P.2d 735. *See also, Doyle v. United States,* 530 F.Supp. 1278 (C.D.Cal. 1982); *Furr v. Spring Grove State Hospital,* 53 Md.App. 474, 454 A.2d 414 (1983).

In essence, defendant argues that the instant case presents an even clearer basis than *Thompson* for a finding of no duty. It is argued that even according to the allegations in the complaint, Hinckley had no history of violence directed to persons other than himself; he had no history of arrests; no previous hospitalizations arising from any violent episodes; and in fact, he did not appear to be a danger to others. Thus, defendant asserts, this case involves, and plaintiffs have pled, none of the "warning signs" by which Hinckley's conduct or mental state would give rise to a duty on the part of Dr. Hopper.

■ Defendant further argues that Dr. Hopper could not have warned law enforcement officials or others of Hinckley's potential for danger to others because to do so would have breached the confidentiality mandated under Colorado law.[1] Defendant also asserts that under the prevailing statutory and constitutional standards, Dr. Hopper could not have had Hinckley committed.[2] Finally, defendant reasons that under *Iverson v. Solsbery,* Colo.App., 641 P.2d 314 (1982), which enumerates the factors to be considered in determining whether a legal

---

1. Defendant cites Colo.Rev.Stat. § 27–10–120(1) (1973), which provides that except in limited circumstances, all information obtained through the provision of counseling services under the mental health article shall be privileged and confidential. Defendant interprets this statute as a legislative limitation on the *Tarasoff* duty to warn. Plaintiffs dispute the applicability of this statute to Dr. Hopper's treatment of Hinckley.

2. The Colorado standard for involuntary commitment requires that the person or facility seeking commitment show by clear and convincing evidence that the patient is mentally ill and, as a result of such mental illness, a danger to others or to himself or gravely disabled. Colo.Rev.Stat. § 27–10–107, 108, 109, 111(1) (1973); *People v. Lane,* 196 Colo. 42, 581 P.2d 719 (1978).

duty exists, all the pertinent factors point to a finding of no duty in this case.[3] In short, defendant claims that the imposition of a broad duty upon psychotherapists would severely hinder the practice of mental health treatment by destroying the confidentiality which is essential to the process, and by encouraging increased in-patient treatment instead of fostering the philosophy that patients should be encouraged to become independent and self-sufficient.[4]

Plaintiffs have responded to each of the arguments. First plaintiffs assert that the therapist-outpatient relationship between Dr. Hopper and Hinckley was a "special relationship" within the meaning of Restatement (Second) of Torts § 315.[5] Plaintiffs argue that the duty to warn imposed in *Tarasoff* was premised on the assumption that such a special relationship exists between psychotherapist and patient, and, in support, they rely in large part on the case of *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185 (D.Neb.1980). In *Lipari,* it was held that the relationship between psychotherapist and patient gives rise to an affirmative duty for the benefit of third persons, and that such a duty arises when, in accordance with the standards of the profession, the therapist knows or should know that the patient's dangerous propensities present an unreasonable risk of harm to others. The *Lipari* court refused to rule as a matter of law that a reasonable therapist would never be required to take precautions other than warnings, or that there is never a duty to attempt to detain a patient. The court found that those issues could only be determined after the parties had had an opportunity to prove what precautions a reasonable psychotherapist would take under the circumstances of the particular case. *Id.* at 193.

In support of their argument that a special relationship existed between Dr. Hopper and Hinckley, the plaintiffs point to specific aspects of that relationship which they claim indicate that Dr. Hopper did exercise control over Hinckley. In particular, plaintiffs point out that Dr. Hopper prescribed valium for Hinckley and administered biofeedback, both with the purpose of altering Hinckley's behavior. Plaintiffs argue that Dr. Hopper could have recommended hospitalization, or could have instituted proceedings to have had Hinckley involuntarily committed. In short, plaintiffs assert that the very essence of the therapist-patient relationship is the control which patient seeks to have the therapist beneficially assert, and that control denominated Dr. Hopper's relationship with Hinckley.

Plaintiffs further argue the duty to control is not limited to those situations where the patient makes specific threats to specific persons. According to plaintiffs, a duty on the part of the therapist arises whenever violence by the patient is foreseeable. In other words, depending on the nature of the patient's behavior, the therapist's duty is multifaceted: it may be to warn the potential victim or law enforcement authorities; it may be to take steps to have the patient confined; it may be to warn the patient's family or guardian of the potential danger; or it may be to take whatever action seems appropriate under the circumstances. Thus, plaintiffs argue, *Tarasoff* dictates that the therapist has a duty to *warn* whenever the patient makes specific threats, but they distinguish a duty to *control* and assert the latter duty arises whenever dangerous behavior by the patient is indicated. Plaintiffs state that they have alleged sufficient facts in the complaint upon which a finding could be made that Hinckley's behavior was

---

**3.** The factors to be considered are the risk, foreseeability and likelihood of injury, and these factors are to be weighed against the social utility of the actor's conduct, the magnitude of guarding against the injury and the consequences of placing that burden on the defendant.

**4.** The stated public policy of Colorado is that mental health patients are to be treated accord-

ing to the least restrictive means. Colo.Rev. Stat. § 27–10–101, *et seq.* (1973).

**5.** In addition to Restatement (Second) of Torts § 315, plaintiffs rely on the following Restatement provisions for support that Dr. Hopper can be held liable for Hinckley's actions: §§ 300, 301, 302, 302B, 308, 311, 319, 321, and 324A.

predictable and therefore Dr. Hopper had a duty to control Hinckley.

Plaintiffs cite several Colorado cases involving third party liability which they believe support the proposition that the Colorado courts would not dismiss this complaint. *Sego v. Mains,*[6] 41 Colo.App. 1, 578 P.2d 1069 (1978); *Leppke v. Segura,*[7] Colo. App., 632 P.2d 1057 (1981). According to plaintiffs, the Colorado appellate courts take a broad view toward third party liability, and focus on the risk-creating situation rather than the foreseeability of a particular victim. Moreover, plaintiffs argue that liability can be imposed upon Dr. Hopper because he did affirmative acts which actually increased the risk that Hinckley would cause harm to others.

## III.

### Discussion

■ In my opinion, the main issue raised by the pleadings and briefs is not simply whether the therapist-outpatient relationship is a "special relationship" which gives rise to a legal duty on the part of the therapist; rather the key issue is to what extent was Dr. Hopper obligated to protect these particular plaintiffs from this particular harm?[8] It is implicit in the majority of cases in this area that the therapist-patient relationship is one which under certain circumstances will give rise to a duty on the part of the therapist to protect third persons from harm. *Tarasoff v. Regents of University of California, supra.* However, the existence of a special relationship does not necessarily mean that the duties created by that relationship are owed to the world

at large. It is fundamental that the duty owed be measured by the foreseeability of the risk and whether the danger created is sufficiently large to embrace the specific harm. *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928).

■ It is this requirement of foreseeability which has led numerous courts to conclude that a therapist or others cannot be held liable for injuries inflicted upon third persons absent specific threats to a readily identifiable victim. *Thompson v. County of Alameda, supra; Doyle v. United States,* 530 F.Supp. 1278 (C.D.Ca.1982); *Furr v. Spring Grove Hospital, supra; Megeff v. Doland, supra; see also Hasenei v. United States, supra* at 1012, n. 22; *c.f. Jablonski v. United States,* 712 F.2d 391 (9th Cir.1983) (hospital liable for acts of outpatient where victim was foreseeable object of patient's violence). Unless a patient makes specific threats, the possibility that he may inflict injury on another is vague, speculative, and a matter of conjecture. However, once the patient verbalizes his intentions and directs his threats to identifiable victims, then the possibility of harm to third persons becomes foreseeable, and the therapist has a duty to protect those third persons from the threatened harm.

■ For purposes of this motion only, it must be assumed that Dr. Hopper's treatment and diagnosis of Hinckley fell below the applicable standard of care. Moreover, the doctor-patient relationship between Dr. Hopper and Hinckley was one which gave rise to certain duties on the part of Dr. Hopper. The real question, however, is whether that duty encompasses the injuries

---

**6.** In *Sego v. Mains,* plaintiff sought damages for negligence on the part of a custodian based on the injurious acts of the custodian's ward. The *Sego* court rejected plaintiff's theory, stating the "majority approach is that, in the absence of proof that a mentally ill person is dangerous to others, the custodian will not be held as a guarantor of the public safety." *Id.* at 1072. According to plaintiffs, this language necessarily implies that where the dangerous propensities of a mentally ill person are known, broad duties arise on the part of those who have control over that person's behavior, and failure to exercise control would result in liabil-

ity to third persons who suffer injuries at the hands of the mental patient.

**7.** In *Leppke v. Segura,* defendants who helped an obviously intoxicated person jump-start his car were held liable to persons injured when the drunk driver caused a serious accident.

**8.** Definition of the scope of the defendant's duty is a question of law for the court. *Metropolitan Gas Repair Serv., Inc. v. Kulick,* Colo., 621 P.2d 313 (1980). *See also, Sanchez v. United States,* 506 F.2d 702 (10th Cir.1974).

of which plaintiffs complain. In other words, was there a foreseeable risk that Hinckley would inflict the harm that he did?

Accepting as true the facts alleged in the complaint and viewing them in a light most favorable to plaintiffs, it is my conclusion that plaintiffs' injuries were not foreseeable; therefore, the plaintiffs fall outside of the scope of defendant's duty. Nowhere in the complaint are there allegations that Hinckley made any threats regarding President Reagan, or indeed that he ever threatened anyone. At most, the complaint states that if Dr. Hopper had interviewed Hinckley more carefully, he would have discovered that Hinckley was obsessed with Jody Foster and the movie "Taxi Driver", that he collected books on Ronald Reagan and political assassination, and that he practiced with guns. According to plaintiffs, if Dr. Hopper had properly performed his professional duties, he would have learned that Hinckley suffered from delusions and severe mental illness, as opposed to being merely maladjusted. Even assuming all of these facts and many of plaintiffs' conclusions to be true, the allegations are still insufficient to create a legal duty on the part of Dr. Hopper to protect these plaintiffs from the specific harm.

■ The parties have for the most part cast their arguments in terms of whether the relationship between Dr. Hopper and *Hinckley* gave rise to a particular duty on the part of Dr. Hopper. However, the legal obstacle to the maintenance of this suit is that there is no relationship between Dr. Hopper and *plaintiffs* which creates any legal obligation from Dr. Hopper to these plaintiffs. As explained by Justice Cardozo, negligence is a matter of relation between the parties, and must be founded upon the foreseeability of harm to the person in fact injured. *Palsgraf v. Long Island R. Co.,* 162 N.E. at 101. *See also, Taitt v. United States of America,* Civil Action No. 82–M–1731 (D.Colo.1983) (Matsch, J.).

■ The question of whether a legal duty should be imposed necessarily involves social policy considerations. See *Prosser, Law of Torts* § 43, 257 (4th Ed.1971). In the present case, there are cogent policy reasons for limiting the scope of the therapist's liability. To impose upon those in the counseling professions an ill-defined "duty to control" would require therapists to be ultimately responsible for the actions of their patients. Such a rule would closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment. Human behavior is simply too unpredictable, and the field of psychotherapy presently too inexact, to so greatly expand the scope of therapists' liability. In my opinion, the "specific threats to specific victims" rule states a workable, reasonable, and fair boundary upon the sphere of a therapist's liability to third persons for the acts of their patients.

The present case is one which makes application of the previously stated rules and policy considerations particularly difficult. Plaintiffs' injuries are severe and their damages extensive. Their plight as innocent bystanders to a bizarre and sensational assassination attempt is tragic and evokes great sympathy. Nevertheless, the question before the Court is whether Dr. Hopper can be subjected to liability as a matter of law for the injuries inflicted upon plaintiffs by Hinckley. I conclude that under the facts pleaded in the complaint, the question must be answered in the negative.

Accordingly, it is

ORDERED that defendant's motion to dismiss is granted.