775 P.2d 1117

Robert B. HAMMAN and Alice L. Hamman, husband and wife, Plaintiffs–Appellants,

v.

COUNTY OF MARICOPA, a political subdivision, dba Maricopa County Medical Center (formerly known as Maricopa County General Hospital); and Manuel G. Suguitan and Jane Doe Suguitan, his wife, Defendants–Appellees.

No. 1 CA–CIV 8611.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 15, 1987.

**54**

Babbitt & Norgren by Robert B. Norgren, Tempe, for plaintiffs-appellants.

Thomas E. Collins, Maricopa County Atty. by Lyle R. Huffman, Deputy County Atty., Phoenix, for defendants-appellees.

## OPINION

JACOBSON, Presiding Judge.

This is an appeal from summary judgment granted in favor of appellees Maricopa County and its employee, Manuel G. Suguitan, M.D. (Dr. Suguitan), in a malpractice action brought by appellants arising out of Dr. Suguitan's psychiatric treatment of their son at the County's emergency clinic.

Since this appeal arises from summary judgment, we view the evidence in a light most favorable to appellants. *Transamerica Insurance Group v. Meere,* 143 Ariz. 351, 353, 694 P.2d 181, 183 (1984). Robert and Alice Hamman are respectively the stepfather and natural mother of John Carter. The Hammans first became aware that Carter might be suffering from a mental disorder on July 4, 1981, when Carter was admitted to Desert Samaritan Hospital after causing a disturbance at a convenience market. Carter's behavior was apparently related to the use of drugs, possibly PCP. Several hours after he arrived, Carter was taken from Desert Samaritan Hospital to Maricopa County Hospital and then released a few hours later.

Following the July 4 incident, Mrs. Hamman observed that Carter continued to act in an abnormal fashion. She stated that Carter shaved his entire body with a razor; he would only bite his food when the Hammans bit their food; he would often run away; he crawled on his hands and knees like an animal; he made threatening gestures and mumbled garbled words; he heard voices; he asked questions and answered them himself.

On August 10, 1981, Mrs. Hamman took her son to Desert Samaritan Hospital. She was advised, however, that Carter needed to go to the Maricopa County Crisis Center instead. She took Carter to the Crisis Center where he was seen by Dr. Suguitan who diagnosed Carter as schizophrenic and admitted him to the hospital.[1]

While he was hospitalized, Carter experienced hallucinations, blocking and loose associations indicative of a symptomology of being psychotic. Additionally, Carter's psychiatric nursing plan during this hospitalization indicated "seclude and restrain from agitation, assaultive or dangerous behavior." These were the procedures to be followed if Carter became agitated and assaultive, or if he displayed behavior dangerous to himself or others. As part of Carter's treatment, Dr. Suguitan prescribed Navane, an anti-psychotic drug, and Cogentin, a drug to neutralize the side effects of Navane. Carter was released from Maricopa County Hospital on August 26, 1981, with directions to continue taking the medication. Mrs. Hamman, however, was unaware of the release until her daughter informed her that John had gone to live with his older sister in Mississippi. While in Mississippi, Carter exhibited behavior which caused his sister to fear him. She relayed these fears to Mrs. Hamman. Mrs. Hamman spoke to Carter by telephone during the period of time that he was in Mississippi and believed that he was not responding appropriately. Consequently, she refilled Carter's prescriptions and sent them to her daughter. There were difficulties, however, in getting Carter to take his medication regularly.

---

1. Dr. Suguitan's more definitive diagnosis was "schizophreniform," which, we understand, is the same as schizophrenia but is used where the condition has been present for less than six months.

Subsequently, it was decided that Carter should return to his home in Arizona. When he arrived by bus in Holbrook, Arizona on January 2, 1982, the Hammans were at the bus station to pick him up. Carter did not recognize either his mother or stepfather. The Hammans drove Carter from Holbrook to their home in Mesa. At various times during the trip, Carter cried, threatened to put people who were in a restaurant on the roof, attempted to turn over the table in a restaurant, and shook his mother's head violently.

After returning to Mesa, Carter continued to act abnormally, making growling sounds and strange facial expressions, hearing voices and laughing inappropriately. Mrs. Hamman also discovered magazine pictures of animals that had the heads cut off them in Carter's wallet. She stated that she was concerned and fearful that Carter either would be killed or would kill somebody.

Carter ran away from the Hamman's home several times. On one occasion, Carter told his mother that he had been at the "old homestead" in Chandler waiting for his father. At the time he returned, Carter was wearing five shirts, two pairs of jeans, and three pairs of socks. Additionally, his feet were blistered from the arches through the toes. Carter apparently did not understand when Mrs. Hamman told him that his father was dead and that they no longer lived in Chandler.

During the first few days following Carter's return to the Mesa home, Mrs. Hamman was careful about discussing whether he needed to go to the hospital because she was fearful of what he might do. When the subject was finally broached and Carter agreed to go to the hospital, the Hammans took Carter to the Maricopa County Hospital Crisis Center on January 5, 1982, where he was again seen by Dr. Suguitan at approximately 2:00 p.m.

Prior to being seen by Dr. Suguitan, a social worker had written on Carter's chart that he was exhibiting "bizarre" behavior. The specifics of that behavior were not documented. Dr. Suguitan stated that he made no attempts to interview Alice Hamman about her son's condition. Mrs. Hamman stated that she told Dr. Suguitan in detail about Carter's behavior upon his return from Mississippi, including the pictures he kept in his wallet, the strange faces, the growling animal sounds, and the fact that she considered his general behavior threatening.

Although Mrs. Hamman begged to have her son admitted to the hospital, Dr. Suguitan refused and discharged Carter with another prescription for Navane and Cogentin. The evidence is substantially conflicting with respect to whether Dr. Suguitan advised Mrs. Hamman to take Carter for follow-up examination at the Tri–City Mental Health Center. At the time he prescribed the medication, Dr. Suguitan was aware that Carter had not been taking his medication immediately prior to January 5, 1982, and that in such cases injections could be given which would last from two to three weeks.

Mrs. Hamman stated in her deposition that Carter had spent approximately 30 minutes at the crisis center when he was released to her with the prescriptions. She also stated that Suguitan informed her that Carter was schizophrenic and psychotic, but that he was "harmless." Dr. Suguitan denies having made that statement. Upon his release, Carter immediately fled from the hospital and ran down the street brushing his teeth. The Hammans followed Carter down the street and were finally able to get him into their truck and take him home. They gave him the medication as prescribed.

On January 7, 1982, Carter attacked his stepfather, beating him over the head with wooden dowels. Mr. Hamman suffered a heart attack during the beating as well as severe brain damage as a result of the blows to his head. Carter was criminally charged in the beating of Robert Hamman, but he was found not guilty by reason of insanity.

There is no contention that Carter made threats of violence against anyone or that on January 5, 1982, Carter was commitable as being a danger to himself or to others. Nor is there any contention that Dr. Sugui-

tan misdiagnosed Carter's condition as schizophrenic.

The Hammans instituted this action for malpractice against Dr. Suguitan and Maricopa County. Appellees' motion for summary judgment was granted and formal judgment was entered against the Hammans. The Hammans timely appealed to this court.

### DUTY

The Hammans base their cause of action against Dr. Suguitan and Maricopa County on two separate theories of liability (1) that Dr. Suguitan owed them a duty not to negligently diagnose and treat Carter's condition, and (2) that they reasonably relied upon Dr. Suguitan's advice that Carter was "harmless."

In connection with the first theory, the Hammans contend that on January 5, 1982, Dr. Ŝuguitan should have made an assessment of Carter's propensity for violence and should have admitted Carter to the hospital so that necessary treatment could have been administered. They presented medical opinions that Dr. Suguitan fell below the standard of care in regard to these matters.

Assuming for the purpose of this summary judgment proceeding that the Hammans established that Dr. Suguitan was guilty of malpractice in his treatment of Carter, the question still remains whether that negligence gave rise to a duty on the part of Dr. Suguitan to the Hammans, parties who were not his patients.

We have had occasion to discuss this exact issue in *Cooke v. Berlin*, 153 Ariz. 220, 735 P.2d 830 (App.1987). In *Cooke* we noted that the general common law rule concerning the duty to act for the protection of others is:

[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.

Restatement (Second) of Torts § 314 (1965). We also recognize that at common law there is no duty to control the conduct of a third person or to prevent him or her from causing physical harm to another, with certain exceptions. *See* Restatement (Second) of Torts, § 315.[2]

In analyzing the exceptions stated in Restatement § 315, we quoted with approval from *Hasenei v. United States*, 541 F.Supp. 999 (D. Maryland, 1982):

[t]he typical relationship existing between a psychiatrist and a voluntary outpatient would seem to lack sufficient elements of control necessary to bring such relationship within the rule of § 315. Indeed, lack of control by the therapist and maximum freedom for the patient is oft times the end sought by both the psychiatric profession and the law.

*Id.* at 1009.

Further, in *Cooke*, we examined those policy considerations which govern the creation or negation of a duty of a psychiatrist toward others when diagnosing and treating a third person and held:

[h]aving reviewed those considerations of policy, we conclude that ... no duty may run from the [defendants] to plaintiff's decedent absent a showing of a specific threat to a specific victim.

■ In our opinion, our conclusions in *Cooke* are dispositive of the Hammans' first theory of liability. Therefore, we hold that no duty existed under a theory of negligent diagnosis and treatment.

While less clearly articulated, the Hammans also contend that liability of Dr. Suguitan and Maricopa County can be prem-

---

2. There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

    (a) A special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

    (b) A special relation exists between the actor and the other which gives to the other a right to protection. Restatement (Second) of Torts, § 315 (1965).

ised upon Dr. Suguitan's assurance that Carter was "harmless."[3]

■ In our opinion, material issues of fact exist as to whether this assurance can give rise to liability under section 311, Restatement (Second) of Torts, which provides in part:

> (1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where harm results.
>
> \*     \*     \*     \*     \*     \*
>
> (b) to such third persons as the actor should expect to be put in peril by the action taken.

*Id.*

Illustration 3 to Comment (b) of § 311 is instructive:

> 3. A has charge of B, a lunatic of violent tendencies. A advertises for a servant, and C applies for the employment. A informs C that B is insane, but negligently gives C the impression that B is not violent or dangerous. C accepts the employment, and is attacked and injured by B. A is subject to liability to C.

*Id.*

Under the facts articulated in the record, it can be concluded that the Hammans may be able to prove that because of their reliance on the assurance of Dr. Suguitan that their son John was harmless, they failed to take a course of action which otherwise would have prevented the injury to Mr. Hamman.

This conclusion requires us to consider the trial court's determination that, in any event, Mr. Hamman was not a foreseeable plaintiff. In doing so, we acknowledge that the trial court was making this determination in the context of defendant's negligence for improper diagnosis and treatment. When viewed in the context of the giving of negligent information, the foreseeability issue seems to disappear. The legal principle is easily stated:

> [b]efore liability may be imposed for an act, the prevision of a reasonable person must be able to recognize danger of harm to the plaintiff or one in plaintiff's situation.

*Tucker v. Collar*, 79 Ariz. 141, 146, 285 P.2d 178, 181 (1955).

In this case, if we assume that Dr. Suguitan negligently assured Mrs. Hamman that Carter was harmless, when in fact he was violent, it clearly is foreseeable that the persons directly in contact with Carter would rely upon that assurance and be the persons most likely to be exposed to the violence when it erupted. Mr. Hamman falls within this class of persons.

The judgment of the trial court is reversed and the matter remanded for further proceedings in accordance with this opinion.

CONTRERAS, J., concurs.

CORCORAN, Judge, dissenting in part, concurring in part:

I dissent from the disposition in the majority opinion relating to the plaintiff's claim of negligent diagnosis based on my dissent in *Cooke v. Berlin*. I concur with the majority's disposition regarding the alleged assurance that Carter was "harmless."

---

3. We recognize that Dr. Suguitan refutes this assertion, but we assume the assurance is true for the purpose of this summary judgment disposition.