775 P.2d 1122

**Robert B. HAMMAN and Alice L. Hamman, husband and wife, Plaintiffs–Appellants,**

v.

**COUNTY OF MARICOPA, a political subdivision, dba Maricopa County Medical Center (formerly known as Maricopa County General Hospital); and Manuel G. Suguitan and Jane Doe Suguitan, his wife, Defendants–Appellees.**

No. CV–87–0070–PR.

Supreme Court of Arizona, En Banc.

Jan. 19, 1989.

Babbitt & Norgren by Robert B. Norgren, Tempe, for plaintiffs-appellants.

Thomas E. Collins, Maricopa County Atty. by Lyle R. Huffman, Deputy Maricopa County Atty., Phoenix, for defendants-appellees.

HOLOHAN, Justice (Retired).

We granted the plaintiffs' petition for review to determine the nature and extent of a psychiatrist's duty to third parties injured by the psychiatrist's patient. The plaintiffs filed a tort action against the defendants for injuries inflicted on Robert Hamman by John Carter, a patient of the defendant, Dr. Manuel Suguitan. The superior court granted the defendants' motion for summary judgment, and the Court

of Appeals affirmed the judgment of the lower court in part and reversed in part. 161 Ariz. 53, 775 P.2d 1117 (App.1987).

## FACTS

The facts are a matter of great dispute between the parties, but since we are reviewing the granting of a summary judgment, we consider the evidence in the light most favorable to the party against whom summary judgment was taken. *Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 353, 694 P.2d 181, 183 (1984).

John Carter is the son of plaintiff Alice Hamman, and stepson of plaintiff Robert Hamman. On January 5, 1982, the Hammans brought Carter to the Maricopa County Hospital emergency psychiatric center because Carter had been exhibiting strange behavior. Dr. Suguitan, a psychiatrist who had previously admitted Carter to the hospital in August, 1981, interviewed Carter for about five minutes and noted the following symptoms: (1) anxious but cooperative, (2) fear and apprehension about a place to live, (3) loose associations and blocking,[1] (4) inappropriate affect,[2] (5) tries to conceal depression by grimacing, and (6) employs denial[3] and projection.[4] Dr. Suguitan did not review the medical records of Carter's 1981 hospitalization.

After interviewing Carter, Dr. Suguitan had a discussion with Mrs. Hamman, the specifics of which are disputed by the parties. Mrs. Hamman stated in her deposition that she told Dr. Suguitan the details of Carter's abnormal behavior since his hospitalization in August 1981. She described various incidents of strange behavior, a few instances of violent conduct, and

a recent incident in which Carter was discovered to be carrying photos of animals with their heads cut off. Mrs. Hamman also testified in her deposition that she told Dr. Suguitan that she and Mr. Hamman feared that Carter would either be killed or kill somebody and that they never turned their backs on Carter. Mrs. Hamman further testified that Dr. Suguitan told her that Carter was schizophrenic and psychotic, but that he was "harmless." Dr. Suguitan denied in his deposition that Mrs. Hamman told him about the specific details of the patient's conduct, and he denied that he ever told her that Carter was "harmless."

Dr. Suguitan did not refer to Carter's medical records from his previous hospitalization at Maricopa County. Those records would have shown among other things that Carter expressed jealousy of his stepfather and that the treatment plan had been to "seclude and restrain" the patient from agitation, assaultive, or dangerous behavior. Carter had also been examined and treated in the past at Desert Samaritan Hospital. Dr. Suguitan did not review the patient's medical records from that hospital. Those records would have revealed that Carter had a history of drug abuse and violent behavior, and he had made statements that he wanted to punish someone.

On January 5, 1982, as Mrs. Hamman discussed Carter's behavior and the Hammans' fear of him, she repeatedly begged Dr. Suguitan to admit Carter to the hospital. Dr. Suguitan refused to admit Carter. Instead, he wrote a prescription for Navane, gave it to Mrs. Hamman, and instructed her to give Carter 10 milligrams of Navane each morning and night. Dr.

---

1. "'Loose associations' occur when a person starts talking on one subject and going on a tangent and continues on another subject unrelated to the first topic...."

   "'Blocking' is when a person starts to say something and in midsentence he stops and he is unable to proceed to complete that sentence or statement that he intended to make." (Deposition of Manuel G. Suguitan, M.D., March 7, 1984, at 21).

2. "Affect" is "a freudian term for the feeling of pleasantness or unpleasantness evoked by a stimulus; also the emotional complex associat-

ed with a mental state...." *Dorland's Illustrated Medical Dictionary* 44 (25th ed. 1974).

3. "'Denial' is manifestations when the patient does not want to talk about what is bothering them." (Deposition of Manuel G. Suguitan, M.D. at 34).

4. "Projection" is "a mental mechanism by which a repressed complex is disguised by being regarded as belonging to the external world or to someone else." *Dorland's Illustrated Medical Dictionary* at 1262.

Suguitan admits he ordered this treatment knowing that Carter had not been taking the Navane which had been previously prescribed for him in August, 1981. Mrs. Hamman stated that Dr. Suguitan then told her to call him again in one week. Dr. Suguitan states that he advised Mrs. Hamman to take Carter to Tri–City Medical Center for follow-up care.

Upon being denied admission, Carter fled down the street brushing his teeth. The Hammans eventually persuaded him to get in their truck and go home. They gave him the medication as prescribed that night and again the following morning and night on January 6.

Although Mrs. Hamman tried to give Carter his medication on the morning of January 7, Carter refused to take it. At approximately 11:00 a.m. that day, Mr. Hamman while working on a home project with an electric drill, was attacked without warning by Carter. He repeatedly beat Hamman over the head with wooden dowels. Mr. Hamman suffered a heart attack during the beating as well as severe brain damage from the blows to his head. Carter later stated he believed Mr. Hamman was going to physically attack Mrs. Hamman with the drill, and that he (Carter) reacted as he did to protect his mother. Carter was later criminally charged for the beating, but found not guilty by reason of insanity.

The Hammans subsequently filed this civil action. The complaint contained three counts charging medical malpractice by Dr. Suguitan while employed by Maricopa County, general negligence, and a claim against Maricopa County for negligent training and supervision of psychiatric personnel.

The defendants filed a motion for summary judgment, essentially contending Dr. Suguitan owed no duty to the Hammans because Carter had never communicated to Suguitan any specific threat against the Hammans. The trial court granted the de-

fendants' motion, and entered judgment against the plaintiffs dismissing all their claims for relief.

On appeal,[5] the Court of Appeals divided the plaintiffs' claims into two separate theories of liability: (1) that Dr. Suguitan owed them a duty not to negligently diagnose and treat Carter's condition, and (2) that they reasonably relied upon Dr. Suguitan's advice that Carter was harmless. Regarding the first theory, the majority of the Court of Appeals followed the "specific threats to specific victims" approach. *See Brady v. Hopper*, 570 F.Supp. 1333 (D.Colo.1983), *aff'd*, 751 F.2d 329 (10th Cir. 1984). Under this view, a psychiatrist incurs no duty to any third party unless his patient communicates to the psychiatrist a specific threat against a specific person. The decision of the Court of Appeals followed the rationale enunciated in an earlier case, *Cooke v. Berlin*, 153 Ariz. 220, 735 P.2d 830 (App.1987). The majority in *Cooke* stated, quoting *Brady:*

> [t]o impose upon those in the counseling professions an ill-defined "duty to control" would require therapists to be ultimately responsible for the actions of their patients. Such a rule would closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment. Human behavior is simply too unpredictable, and the field of psychotherapy presently too inexact to so greatly expand the scope of therapist's liability. In my opinion, the "specific threats to specific victims" rule states a workable, reasonable and fair boundary upon the sphere of the therapist's liability for the acts of their patients.

570 F.Supp. 1339.

We agree with the holding in *Brady*. In reaching this conclusion, we are cognizant of the considerations of policy which govern creation or negation of the duty of a psychiatrist toward others when di-

---

5. On appeal, the plaintiffs challenged the trial court's ruling which dismissed their medical malpractice and negligence claims. The record does not indicate that they sought to set aside the dismissal of Count III. The issue was not raised in the petition for review to this court, and we deem the issues in Count III abandoned.

agnosing and treating a third person. Having reviewed these considerations of policy, we conclude that in the instant case no duty may run from the appellees to plaintiff's decedent absent a showing of a specific threat to a specific victim. 153 Ariz. at 226, 735 P.2d at 836.

The same judge who dissented in *Cooke* also filed a dissent in this case. The dissenting judge maintained that psychiatrists owe a duty to any third party foreseeably at risk from the negligent performance of psychiatric services.

The Court of Appeals was unanimous in holding that the plaintiffs had stated a claim for relief on the issue of Dr. Suguitan's assurances that Carter was "harmless." The court held that liability arose under *Restatement (Second) of Torts* § 311 (1965), which provides in part:

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where harm results

.   .   .   .   .

(b) to such third persons as the actor should expect to be put in peril by the action taken.

It is possible, the court concluded, that the Hammans' reliance on Dr. Suguitan's assurances caused them to avoid a course of action which otherwise would have prevented the injury to Mr. Hamman. The court reversed the judgment of the superior court on this issue and remanded the case for trial.

We approve of the ruling of the Court of Appeals that the alleged negligent representation by Dr. Suguitan that Carter was "harmless" stated a valid claim. The issue taken for review is whether Dr. Suguitan and Maricopa County owed a duty to the Hammans, absent a specific threat by the patient against them, properly to diagnose, treat or control the patient.

## ANALYSIS

A negligence action may be maintained only if there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others from unreasonable risks of harm. *Ontiveros v. Borak*, 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983). The issue of duty is usually one for the court as a matter of law. *Beach v. City of Phoenix*, 136 Ariz. 601, 604, 667 P.2d 1316, 1319 (1983). The danger reasonably to be perceived defines the duty to be obeyed. *Chavez v. Tolleson Elementary School District*, 122 Ariz. 472, 476, 595 P.2d 1017, 1021 (App.1979) (quoting *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928)).

In the present case, the defendants do not dispute that an agency relationship existed between Dr. Suguitan and Maricopa County throughout the periods alleged in the complaint. Therefore, any liability incurred by Dr. Suguitan to the Hammans arising from his treatment of Carter would be vicariously imputed to Maricopa County.

### Tarasoff and its progeny

The landmark case regarding the duty of a psychiatrist to protect others against the conduct of a patient is *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976). In *Tarasoff,* the plaintiff alleged that the defendant therapists had a duty to warn their daughter of the danger posed to her by one of the therapists' patients. The *Tarasoff* plaintiffs were the parents of Tatiana Tarasoff, a young woman killed by the patient. Two months prior to the killing, the patient informed his therapist that he intended to kill a young woman. Although the patient did not specifically name Tatiana as his intended victim, the plaintiffs alleged, and the trial court agreed, that the defendant therapist could have readily identified the endangered person as Tatiana.

The *Tarasoff* court applied the *Restatement (Second) of Torts* § 315 (1965) to the facts. Section 315 states:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

The *Tarasoff* court held that the psychiatrist-patient relationship was sufficient under § 315 to support the imposition of an affirmative duty on the defendant for the benefit of third persons. *Tarasoff,* 17 Cal.3d at 435, 551 P.2d at 342–43, 131 Cal. Rptr. at 23. The court ruled that when a psychiatrist determines or, pursuant to the standards of the profession, should determine that a patient presents a serious danger of violence to another, the psychiatrist incurs an obligation to use reasonable care to protect the intended victim against such danger. *Id.* According to the *Tarasoff* court, discharge of that duty may require the psychiatrist to warn the intended victim or others reasonably likely to notify the victim, to notify the police, *"or to take whatever other steps are reasonably necessary under the circumstances."* 17 Cal.3d at 431, 551 P.2d at 340, 131 Cal. Rptr. at 20 (emphasis added).

Although the *Tarasoff* decision did not state that a psychiatrist's duty to third parties arises only when his patient communicates a specific threat concerning a specific individual, numerous subsequent decisions interpret *Tarasoff.* For example, in *Brady, supra,* John W. Hinckley, Jr. injured the plaintiffs in his attempt to assassinate President Reagan. The suit alleged, in part, that Hinckley's psychiatrist had negligently diagnosed and treated him. The *Brady* court held that the psychiatrist owed no duty to the plaintiffs because Hinckley had not made specific threats against a readily identifiable victim. 570 F.Supp. at 1339.

Similarly, in *Thompson v. County of Alameda,* 27 Cal.3d 741, 614 P.2d 728, 167 Cal.Rptr. 70 (1980), the parents of a young child sued the county for the wrongful death of their son. The juvenile offender, James F., killed the child within 24 hours of his release from confinement into the temporary custody of his mother. James stated he would kill a child in the community at random, and the county knew it. Nonetheless, county officials released him without warning local police, parents, or James' mother. Distinguishing *Thompson* from *Tarasoff,* the majority of the California Supreme Court refused to impose "blanket liability." 27 Cal.3d at 753, 614 P.2d at 734, 167 Cal.Rptr. at 76. The court stated that liability may be imposed only in those instances in which the released offender posed a predictable threat of harm to a named or readily identifiable victim. James made a generalized threat to a segment of the population. Consequently, the majority refused to impose upon the psychiatrist a duty to protect such a large group in the community. 27 Cal.3d at 758, 613 P.2d at 738, 167 Cal.Rptr. at 80.

Other courts, however, have not required a specific threat as a prerequisite for liability. Instead, they require that the psychiatrist reasonably foresee that the risk engendered by the patient's condition would endanger others. For example, in *Petersen v. State,* 100 Wash.2d 421, 671 P.2d 230 (1983), a patient was hospitalized for several weeks and treated with Navane after his psychiatrist diagnosed him as having schizophrenic and hallucinogenic symptoms. The hospital allowed the patient to go home for Mother's Day, but required him to return that night. Upon his return, hospital personnel observed the patient driving recklessly and spinning his car in circles on hospital grounds. The psychiatrist nevertheless released the patient the following morning and continued to prescribe Navane even though he knew of the patient's reluctance to take such medication. Five days later, the patient drove through a red light at 50–60 miles per hour, striking plaintiff's car and injuring her. The *Petersen* court emphasized the importance of foreseeability in defining the scope of a person's duty to exercise due care. In affirming plaintiff's claim based on negligent treatment of the patient, the court ruled that the psychiatrist had a duty to protect any person foreseeably endangered by the patient. 100 Wash.2d at 428–29, 671 P.2d at 237.

A somewhat narrower interpretation of this "foreseeably endangered" approach is illustrated in *Jablonski by Pahls v. United States*, 712 F.2d 391 (9th Cir.1983). In *Jablonski*, a psychiatric patient, Phillip Jablonski, had an extensive record of psychiatric and criminal problems and had on numerous occasions tried to kill his ex-wife. Jablonski threatened to use violence against the mother of his girlfriend, Melinda Kimball. Rather than imprison Jablonski, he was allowed to undergo a psychiatric examination at the Loma Linda Veteran's Administration Hospital. The police informed Dr. Berman, the Hospital's head of psychiatric services, of Jablonski's prior criminal record and recent violence. Dr. Berman, however, failed to relay this information to the treating psychiatrist. As a result, the treating psychiatrist diagnosed Jablonski as "potentially dangerous" but did not admit him. He concluded that there was no emergency and no basis for involuntary hospitalization. The psychiatrist did not attempt to obtain Jablonski's prior medical records, which documented his numerous attempts to kill his ex-wife and indicated "future violent behavior was a distinct probability." *Id.* at 393. A second evaluation four days later, again indicated Jablonski was dangerous, but the psychiatrist found no basis for involuntary hospitalization. Two days thereafter, Jablonski attacked and killed his girlfriend, Melinda Kimball.

Kimball's minor daughter brought a wrongful death action against the United States under the Federal Tort Claims Act. The action alleged negligence by psychiatrists in treating Jablonski. Applying *Tarasoff*, the district court found three separate instances of the psychiatrists' malpractice: failure to (1) transmit the information from the police, (2) obtain Jablonski's past medical records, and (3) warn Jablonski's girlfriend. In affirming the findings of the district court, the Court of Appeals noted that the case fell somewhere between the extremes of the specific threats cases and the broad "foreseeably endangered" cases. The appellate court held that, although no specific threats were made, Jablonski's record of violence toward his ex-wife indicated that his girlfriend was a more "sufficiently targeted" victim than were random members of the community. *Id.* at 398. The court reasoned that review of the medical records and police report provided the necessary information that Jablonski's girlfriend was a foreseeable victim. Hence, the failure to obtain the records was vital to the conclusion that the psychiatrists breached their duty to protect third parties.

In the present case, the Court of Appeals would limit a psychiatrist's duty and liability to cases in which there are specific threats against third parties, *i.e.*, the *Brady* approach. The plaintiffs concede that Carter never made any specific threats against Mr. Hamman.

## STANDARD

We believe the *Brady* approach is too narrow. *Tarasoff* envisioned a broader scope of a psychiatrist's duty when the court stated: "[O]nce a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." 17 Cal.3d at 439, 551 P.2d at 345, 131 Cal. Rptr. at 25. Additionally, we agree with those cases interpreting *Tarasoff* which state that a psychiatrist should not be relieved of this duty merely because his patient never verbalized any specific threat. We recognize the concern about adopting a rule which would be too inclusive, subjecting psychiatrists to an unreasonably wide range of potential liability. However, we believe that the approach used by the Ninth Circuit in *Jablonski* allays such fears and represents a sound analytical foundation for the facts before us. In holding that Jablonski's girlfriend (Kimball) was a foreseeable victim, the court stated:

Unlike the killer in *Tarasoff*, Jablonski made no specific threats concerning any specific individuals. Nevertheless, Jablonski's previous history indicated that he would likely direct his violence

against Kimball. He had raped and committed other acts of violence against his wife. His psychological profile indicated that his violence was likely to be directed against women very close to him. This, in turn, was borne out by his attack on Pahls. Thus, Kimball was specifically identified or "targeted" to a much greater extent than were the neighborhood children in *Thompson*.

712 F.2d at 398.

■ Dr. Suguitan was aware that schizophrenic-psychotic patients such as Carter are prone to unexpected episodes of violence. He knew that Carter was living with and being cared for by the Hammans. Dr. Suguitan, in denying Carter's admission to the hospital, released the patient into the care of the Hammans. If indeed Dr. Suguitan negligently diagnosed Carter as harmless, the most likely affected victims would be the Hammans. Their constant physical proximity to Carter placed them in an obvious zone of danger. The Hammans were readily identifiable persons who might suffer harm if the psychiatrist was negligent in the diagnosis or treatment of the patient. The fact that Carter never verbalized any specific threats against the Hammans does not change the circumstances that, even without such threats, the most likely victims of the patient's violent reaction would be the Hammans. We reject the notion that the psychiatrist's duty to third persons is limited to those against whom a specific threat has been made. We hold that the standard originally suggested in *Tarasoff* is properly applicable to psychiatrists. When a psychiatrist determines, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, the psychiatrist has a duty to exercise reasonable care to protect the *foreseeable victim* of that danger. The foreseeable victim is one who is said to be within the zone of danger, that is, subject to probable risk of the patient's violent conduct.

## CONTROL

The defendants contend that Dr. Suguitan did not fail in any obligation to protect the Hammans. They point out that any duty by the psychiatrist to control his patient is limited by statute.[6] Unless a patient meets the statutory criteria, the psychiatrist cannot involuntarily admit a patient into the hospital.

The defendants argue if the patient was not dangerous, there could be no involuntary commitment. Dr. Suguitan found Carter not dangerous, therefore, he could not be committed and the defendant could not control him.

The plaintiffs, however, submitted evidence from two psychiatrists in opposition to the defendants' motion for summary judgment. The plaintiffs' psychiatrists, in their affidavits, stated that a competent examination and proper diagnosis would have disclosed that Carter was a person suffering from a mental illness which made him dangerous to others. He was, therefore, admittable to the hospital on an involuntary basis under the statutes. They further stated that the defendant's examination of the patient fell below the acceptable standard for psychiatrists. The issue of ability to control is one which must be decided at trial.

The plaintiffs' experts in their affidavits also stated that even if Carter was not admittable as an emergency patient, there were numerous other acceptable medical procedures and precautions which Dr. Suguitan should have taken to lessen the danger posed to the Hammans. Some of these other steps include not only warning the Hammans of Carter's potential for danger,

---

6. The relevant provision of Arizona Revised Statutes reads:

§ 36–526. **Emergency admission; examination; petition for court-ordered evaluation**

A. Upon presentation of the person for emergency admission, an admitting officer ... may admit the person to the agency as an emergency patient if the admitting officer finds, ... that there is reasonable cause to believe that the person, as a result of a mental disorder, is a danger to self or others, and that ... the person is likely without immediate hospitalization to suffer serious physical harm or serious illness or to inflict serious physical harm on another person....

but also providing detailed instructions to follow should Carter's condition deteriorate. The doctor should have provided for outpatient follow-up care which would take into consideration the risk inherent in Carter's medical condition. Thus, the discharge of the defendant psychiatrist's duty is not limited to instances when the psychiatrist can control a patient by commitment to a hospital. The psychiatrist to fulfill his duty to those within the zone of risk must take the action reasonable under the circumstances.

## CONCLUSION

The rule which we adopt does not impose upon psychiatrists a duty to protect the public from all harm caused by their patients. We do not, however, limit the duty of the psychiatrist to third parties only in those instances in which a specific threat is made against them. We hold that the duty extends to third persons whose circumstances place them within the reasonably foreseeable area of danger where the violent conduct of the patient is a threat.

That part of the Court of Appeals' opinion which is inconsistent with views expressed herein is vacated. The judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON, J., concur.

MOELLER, J., did not participate in the determination of this matter.