Skoglund, J.,
¶ 116. dissenting. I concur in the Chief Justice’s well-reasoned, indeed unassailable, dissent. The majority has created a heretofore unheard of duty based on an allegation in a complaint. This new duty to train or assist or inform a patient’s caretakers so as to protect the public finds no support in case law or public policy. It is illogical, potentially fatal to effective patient-therapist relationships, and places an impossibly onerous obligation on those who provide mental health care to the people of this state.
¶ 117. The facts of this case center around an unprovoked, spontaneous act of violence directed against a stranger by an individual suffering from a serious mental illness. Nothing short of anticipatory confinement in a hospital could have prevented it. But now, severely crippling Vermont’s public policy of treatment of the mentally ill in the least restrictive environment, the majority has delivered a cautionary tale involving the threat of tort liability for releasing a mentally ill person to people not sufficiently warned/ trained to provide care and control. This is a preposterous, reckless decision.
*386 ¶ 118. The majority opinion identifies the cautious and thoughtful evolution of the duty owed by mental health professionals begun in Tarasoff v. Regents of University of California, 551 P.2d 334 (Cal. 1976), Thompson v. County of Alameda, 614 P.2d 728 (Cal. 1980), and the cases that came after. It then abruptly abandons consideration of identified victims or reasonably identifiable victims and finds a duty “to warn E.R.’s parents as individuals in the ‘zone of danger’ of E.R.’s dangerous propensities.” Ante, ¶ 51. However, in the next paragraph it limits the duty only to those who are engaged with the patient’s treatment, not those that simply live with him. Ante, ¶ 52. That “zone” is flexible, fluid and ambiguous.
¶ 119. First of all, I posit that the parents of E.R. knew he could be dangerous as it was his behaviors in their home that precipitated his initial hospitalization. They were privy to the discharge summary from the Brattleboro Retreat and worked with the Retreat to develop an aftercare treatment plan that included regular visits to Northeast Kingdom Human Services (NKHS). They were aware he was on antipsychotic medications and had been told that they should give E.R. his medications and not rely on him to medicate himself. The mother knew enough to be concerned when E.R. told her he had stopped taking his medication. They had been warned. They knew E.R. could be dangerous when deep in his illness. What further warning should have been offered remains a mystery.
¶ 120. What is substantially more troubling is the framework upon which the majority builds its new duty. As explained by the Chief Justice in his dissent, the majority relies on the “zone-of-danger” doctrine that simply is not implicated in this case. There is no allegation E.R. threatened his parents. The parents were not injured. And, the actual victim could not have been identified as a reasonably identifiable potential victim, the expanded class the doctrine is designed to protect.
¶ 121. The majority finds Hamman v. County of Maricopa, 775 P.2d 1122 (Ariz. 1989), “persuasive” and claims to follow its reasoning. The Hammam case is completely distinguishable from the case at bar. In Hammam, the doctor refused to admit the patient to the hospital and, according to the parents, told them their son was “harmless.” Id. at 1123. Two days later, the son viciously attacked the stepfather. The court noted that the doctor was aware that schizophrenic-psychotic patients are prone to *387 unexpected episodes of violence, knew that the son was living with his parents, and thus should have known that “[i]f indeed [the doctor] negligently diagnosed [the son] as harmless, the most likely affected victims would be the Hammans. Their constant physical proximity to [their son] placed them in an obvious zone of danger. The Hammans were readily identifiable persons who might suffer harm if the psychiatrist was negligent in the diagnosis or treatment of the patient.” Id. at 1128. The majority neglects to provide any analysis to link the case at bar with the situation described in Hamman.
¶ 122. Under this new duty, mental health providers will have to consider generalized threats of violence directed against no one in particular, which I suggest are commonplace with severely ill patients, and will have to weigh whether to violate the patient-physician privilege, thus damaging whatever therapeutic relationship existed and perhaps the treatment of the patient as well. After the risk assessment, they will then, in trying to place the patient in the least restrictive environment available, need to do an educational assessment of potential caregivers. As the Chief Justice notes, the majority identifies no professional standards, legal authority, or public policies to support a duty so “extraordinary in its scope and implications.” Ante, ¶ 99. Long after this Court has forgotten about it, this amorphous duty to train or assist will continue to perplex and bedevil practitioners in the field of mental health who must actually attempt to understand the obligations imposed and comply.
¶ 123. Finally, the majority disposes of statutes and regulations that govern confidential communications between patient and physician by suggesting that, one, they only codify an evidentiary privilege, and two, they do not prohibit disclosure to “caregivers” involved in the patient’s aftercare plan. Ante, ¶ 61. This is a breathtaking disregard for the tort liabilities or ethical claims that can result from the disclosure of health information or history and a startling conclusion that no objection occurs to them for the wholesale disclosure of a person’s mental health condition and history to the ambiguous sobriquet “caretaker.”
¶ 124. The manner in which the majority disposes of the requirements of HIPAA’s Privacy Rule is rather cavalier. It notes two exceptions relevant to the disclosure obligation imposed in this decision. The first, the dangerous patient exception to the confidentiality requirement intended to “avert a serious threat to *388 health or safety,” permits disclosure when the disclosure “[i]s necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public.” 45 C.F.R. § 164.512(j). Relying on “E.R.’s propensity for violence,” the majority finds the subsection permits disclosure, ignoring the requirement that a perceived serious threat must be imminent.
¶ 125. The majority identifies a second useful exception, one providing for standard uses and disclosures for involvement in an individual’s care and notification purposes, citing to the provision for emergency circumstances. 45 C.F.R. § 164.510(b)(3). The majority forgets to mention that the section’s primary application is for “Limited uses and disclosures when the individual is not present.” It then latches onto the conjunctive modifying language contained in the section, “[i]f the individual is not present, or the opportunity to agree or object to the use or disclosure cannot practicably be provided because of the individual’s incapacity or an emergency circumstance,” to support its dismissal of HIPAA concerns. I suggest that the section is intended to apply when “the individual’s incapacity” is of a sort that renders him unconscious. Again the majority finds the subsection permits disclosure.
¶ 126. Decisions to create and impose new legal duties on other learned professions have profound consequences. To impose a novel legal duty on mental health care professionals without extensive discussion of the professional knowledge, skills, and practice standards — if any — that may apply and the policy consequences that may result, is not merely, as the Chief Justice suggests, “presumptuous.” It is the essence of judicial arrogance.