**Margareta B. LINDSEY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CIV–85–2936–P.**

United States District Court, W.D. Oklahoma.

Feb. 9, 1988.

---

Mark A. Oruch, Rebecca Schneider, Birdsong & Brown, Oklahoma City, Okl., for plaintiff.

Wm. Lee Borden, Jr., William S. Price, Roger Griffith, Oklahoma City, Okl., for defendant.

## ORDER OF DISMISSAL AND SANCTIONS

PHILLIPS, District Judge.

### I. INTRODUCTION

This is a sad and unfortunate case involving the stabbing of Margareta B. Lindsey by a Vietnam era veteran, Forest Neil Simon, Jr. ("Simon"). Simon, who had a long and troubled history of mental treatment by the Veterans Administration following his release from military service, committed suicide subsequent to the stabbing incident involving plaintiff. The substance of Plaintiff's contentions is that the Veterans Administration (1) knew of Simon's dangerous propensities, (2) was aware of a recent assault made by Simon upon another individual just prior to the stabbing incident involving Lindsey, and (3) despite this knowledge, the Veterans Administration refused to admit Simon at the request of Simon's father, which refusal proximately caused the injuries of Plaintiff. Plaintiff's claim was timely and properly brought pursuant to the provisions of the Federal Tort Claims Act.

A non-jury trial was held in this matter on November 2–4, 1987. For the reasons set forth below, the Court enters judgment in favor of the Defendant United States of America. However, due to the government's belated production on the eve of trial of voluminous medical records of Simon, which were previously requested by Plaintiff but not disclosed by the government, the Court is imposing sanctions against the United States pursuant to Rule 16(f) of the Federal Rules of Civil Procedure.

### II. HISTORY OF THE CASE—FINDINGS OF FACT

On August 26, 1986, Chief Judge Eubanks entered a scheduling order in this case. After a court-authorized extension of certain deadlines on March 6, 1987, the parties completed discovery, filed proposed findings of facts and conclusions of law, and submitted a final pretrial order. The case was subsequently transferred to the undersigned on June 22, 1987, and placed on the Court's October 13, 1987 trial docket. Consistent with the Local Rules of this district and this Court's General Order to Attorneys, the parties were notified that the Court would not permit the introduction of unnoticed exhibits absent extraordinary circumstances. See Appendix IV, page iii, of the Local Rules of the Western District of Oklahoma; General Order to Attorneys Appearing before Judge Layn R. Phillips, at paragraph 26, p. 5; Addendum to Final Pretrial Order of August 5, 1987.

On October 20, 1987, Plaintiff's counsel filed a motion for continuance of the trial. The basis for the motion was that the government had produced, on the eve of the trial, numerous medical records of Forest Neil Simon, Jr., which had previously been requested by Plaintiff's counsel but not produced by the government. The motion also asserted that additional medical records of Simon had been found by the government and would be produced the morning of trial, October 20, 1987.

On the morning of October 20, 1987, the case was called for trial and Plaintiff's

motion for continuance was heard. The government responded to the motion by stating that Plaintiff's counsel had never filed a motion to produce any such documents and had neither issued subpoenas for the documents nor sought to depose any witnesses who might have knowledge of such documents. Plaintiff's counsel responded that no formal discovery request was necessary since counsel for the United States had agreed to produce the medical records of Simon. When questioned about this agreement, Roger Griffith, Assistant United States Attorney, acknowledged that (1) Plaintiff's counsel "asked me to provide him with the medical records of this particular patient"; (2) a search for the medical records had been made "all through the proper agents of the United States government in good faith to find all of those records that were available"; (3) he (Griffith) had made written and oral requests of the Veterans Administration (spanning a two year period) to produce the records for the Plaintiff's inspection and for use at the trial of the case; and (4) a limited number of Simon's medical records were produced to Plaintiff's counsel in the early stages of the case. (Transcript of October 20, 1987, at pp. 7–8). When asked further about the alleged agreement he had with Plaintiff's counsel to produce the medical records of Simon, Mr. Griffith stated:

> Identification (sic) everything in my good faith possible, and I instructed all of my agents to do everything in good faith possible to secure those records and present them. *Id.* at 9.

Despite these efforts by Mr. Griffith, which began in 1985, the bulk of the missing records were found in the Oklahoma City file room of the Veterans Administration in 1987 by Mr. Griffith himself, alongside the medical records previously produced to Plaintiff's counsel. Other medical records of Simon from other Veterans Administration Offices in the United States also turned up on the eve of trial. *Id.* at pp. 1–9. When asked why the records were not found earlier, Mr. Griffith stated, "I cannot answer that your Honor." *Id.* at 9.

The medical records of Forest Neil Simon, Jr., were unquestionably relevant to the case.[1] Even a cursory review of the contentions filed by the parties in June 1987, as well as the final pretrial order filed in August 1987, squarely places the issue of Simon's history of treatment by the Veterans Administration at the heart of the case. While the Court was prepared to consider entering a preclusionary sanction pursuant to Rule 37 which would have prevented the government from relying on the documents at trial, the documents were necessary to both Plaintiff's case and the government's defense and thus were needed to resolve the case on the merits. Accordingly, the Court reluctantly granted Plaintiff's motion for continuance and trial was continued until November 2, 1987.

In the interim, the Court took several additional measures to streamline the trial and to deal with the issue of the newly discovered documents. On October 21, 1987, after consultation with the parties, and without objection, the Court entered a scheduling order requiring the exchange of witness affidavits and expert opinions. Additionally, the Court ordered an initial sanction for the government's failure to produce the previously requested medical records of Simon in a timely fashion. Specifically, the Court required the government to pay for the deposition and transcription costs of four witnesses whose

---

1. *See Id.* at 10–11, 15. Although counsel for the government subsequently attempted to characterize the discovery agreement as including "every available medical record that I knew about and that I could find and that I could see that we could give to him" [*Id.* at 11], this attempt to limit production to only records personally known and available to Mr. Griffith is not supported by the record. Counsel later stated that he believed he was responsible for producing all of the requested medical records within the possession of the government, analogizing his obligation under the agreement to the *Brady* doctrine in criminal cases. ("We're the entire Government, every agent of ours is an agent of mine. I understand that"). *Id.* at 13. In reality, however, the vast majority of the records were not scattered throughout the United States, but were in Oklahoma City and available to government counsel since 1985. *See* Affidavit of Stephen Terry filed October 23, 1987, as well as Terry's trial testimony.

depositions were needed as a result of the undiscovered medical records. *See* Transcript of October 20, 1987 at pp. 17–24; Minute Order of November 3, 1987. In apparent recognition of their failure to complete discovery as required by the pretrial order, the government did not object to this order and paid the costs associated with the depositions, which were telephonically conducted. The November 3, 1987, Order imposing this sanction specifically stated: "This Order is entered without prejudice to the Court entering additional sanctions under Rules 16 and 37 of the Federal Rules of Civil Procedure, if necessary and appropriate under the circumstances of the case." *Id.* Additionally, after noting the hardship the belated document production had worked on the Court (Transcript of October 20, 1987, at pp. 20–23), the Court ordered the Veterans Administration and the government representatives involved in the previously unsuccessful document search to submit affidavits showing why sanctions should not be imposed for failure to produce these documents in a timely fashion. The subsequent record in the case, including the affidavits submitted by counsel and by the record custodians, as well as trial testimony devoted to this matter, clearly established that (1) there was an agreement by the government to produce the medical records of Simon to Plaintiff's counsel, (2) Assistant United States Attorney Griffith attempted to comply with this agreement by issuing written and oral directives to the Veterans Administration to produce the records, (3) the Veterans Administration, through negligence or an incompetent document search, failed to discover and turn over the additional records, including the medical records contained in the Oklahoma City Medical Center. *See, e.g.,* Transcript of October 20, 1987; Affidavits submitted on October 23, 1987; Affidavit of Mark A. Oruch of December 2, 1987, and Exhibit A; Affidavit of Rebecca K. Schneider of December 2, 1987.

The trial of this case was held from November 2, 1987 through November 4, 1987. After the trial of the case was completed, and while the Court was considering the imposition of additional sanctions, the government did an "about face" on the issue of the undisclosed documents, claiming that *no* agreement had been entered into with Plaintiff's counsel to produce the records in question. These arguments were based upon an *in camera ex parte* affidavit filed by Assistant United States Attorney Roger Griffith on November 24, 1987, which attacked the integrity and competency of opposing counsel and disavowed any agreement to produce the records in question to Plaintiff's counsel. *See* Griffith Affidavit of November 24, 1987 at 4, 8–9. In contrast to the previous record in the case, which clearly established that the government had agreed but failed to produce the records in question, Mr. Griffith now took the position that Plaintiff's counsel made only one request "for a copy of the *incomplete* medical records in [government counsel's] possession." *Id.* at 7. Indeed, government counsel now claimed in the *ex parte* affidavit that the records were sought solely "to prepare its case, not because of a *non-existent* informal agreement with Plaintiff's counsel." *Id.* [Emphasis added].

Due to the *ex parte* nature of the affidavit and the reversal of the government's position in an apparent attempt to avoid further sanctions, the Court directed that Mr. Griffith's affidavit be filed on the public record and that opposing counsel be given the opportunity to respond. Responsive affidavits were filed by Plaintiff's counsel and a hearing was held on December 3, 1987. *See* Order of November 24, 1987. For the reasons set forth at the hearing held in this matter, as well as the reasons set forth in Section V of this opinion, the Court finds the explanation of the government to be unpersuasive and disingenuous. Moreover, the government's action in this case has worked a hardship on the Court, turning an otherwise straightforward case into an organizational nightmare, wasting dozens of hours of both the Court's and opposing counsel's time on an issue that should have been resolved many months prior to trial. As a result, due to the government's failure to comply with

the scheduling order in this matter, the government's failure to produce the requested documents in a timely fashion, and the government's failure to adequately prepare this case for trial, the Court will require the government, as an additional sanction for failure to produce the documents in question in a timely fashion, to pay the reasonable attorney fees of Plaintiff incurred after October 20, 1987, which can be directly attributed to the belatedly produced documents. Plaintiff, however, will not recover on the merits of the case for the reasons set forth below.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises out of the stabbing of Margareta B. Lindsey by Forest Neil Simon, Jr., on December 1, 1983. Plaintiff contends that the Veterans Administration refused to admit Simon when, approximately three days prior to the stabbing, Simon's father contacted the Veterans Administration requesting that his son be admitted. Moreover, Plaintiff relies heavily upon an alleged assault by Simon upon Kay Harris on November 28, 1983, of which Plaintiff contends the Veterans Administration was aware. According to Plaintiff's theory of the case, the Veterans Administration's refusal to admit Simon for treatment after the assault on Harris and after the request of Simon's father, was the direct and proximate cause of Plaintiff's injury. *See,* closing argument transcript.

### A. STIPULATED FACTS.

The parties have stipulated to the following facts. (*See* Stipulation of Facts, filed October 20, 1987; Court's Exhibit 1). Those facts are:

1. Plaintiff was repeatedly stabbed by Forest Simon, Jr., on December 1, 1983. She incurred medical expenses in the amount of $10,117.09 as a result of the stabbing. The medical invoices and records shall be admissible without objection, with the exception of future medical care which may be required.

2. Forest Simon, Jr., was under the care of the Veterans Administration Hospital in Oklahoma City at the time he stabbed the Plaintiff.

3. Plaintiff filed a claim for damages in the sum of $259,494.04 with the Veterans Administration in a timely manner. The claim was denied and Plaintiff filed suit in this Court in a timely manner.

4. The medical records on Forest Simon, Jr., which Defendant provided to Plaintiff are admissible without objection.

5. Pictures of Plaintiff taken directly after the stabbing are admissible without objection.

6. Forest Simon, Sr. [Forest Simon Jr.'s father] and Forest Simon, Jr., are both deceased [and were deceased at the time of trial].

7. Forest Simon, Jr. was first diagnosed as schizophrenic by Dr. Charles Smith, Oklahoma City Veterans Administration Medical Center in 1972.

8. Forest Simon, Jr. stabbed his mother in 1975 and was admitted to the Veterans Administration Medical Center ["VAMC"] in Oklahoma City, pursuant to Court Order on February 24, 1975. That he remained in this hospital until March 7, 1975 when he was transferred to the VAMC in Topeka, Kansas, where he remained until July 16, 1975. He was diagnosed schizophrenic paranoid type. He was then released from Kansas for continuous outpatient treatment in the Oklahoma City VAMC. He attempted suicide while in the VAMC in Topeka by slashing his wrists. After stabbing his mother, Forest Simon, Jr. was an inpatient in Veterans Administration hospitals for 131 days.

9. Forest Simon, Jr. attempted suicide by overdose of barbiturates in 1976. He was admitted to the VAMC in Oklahoma City, and was a patient there from April 1, 1976 until April 27, 1976, at which time he was transferred to the VAMC in Topeka, Kansas, for extensive treatment. He was diagnosed paranoid schizophrenic, periodically depressed and violent. On August 28, 1976, Topeka discharged him because he had reached the maximum plateau as an inpatient. He was discharged to the

VAMC in Oklahoma City for follow-up care as an outpatient.

10. On March 1, 1987, Simon again attempted suicide by overdose. He was taken to Baptist Hospital and transferred to VAMC in Oklahoma City on March 3, 1978, where he remained as an inpatient until March 9, 1978. At this time, he was discharged to begin private psychiatric treatment.

11. There are no records available from March 9, 1978 until December 1, 1981 on Forest Simon, Jr.

12. On December 11, 1981, patient resumed treatment at the VAMC, in Oklahoma City, as an outpatient.

13. From March 5, 1982 until March 25, 1982, Forest Simon, Jr. was an in-patient in a VAMC in Brentwood, California, and was declared incompetent, effective July 16, 1982.

The following additional findings of fact are made by the Court upon its review of the evidence, some of which may overlap with the stipulated facts set forth above:

### B. MARGARETA B. LINDSEY.

1. Plaintiff Margareta B. Lindsey had been the housekeeper of Forest Simon, Sr. for many years and had been a close friend of Simon's father since 1971. Plaintiff had an excellent relationship with Simon prior to the attack on her on December 1, 1983. The assault on her was the first time he had ever exhibited any threatening, aggressive or violent behavior toward Plaintiff.

Plaintiff and Simon had never argued. He was very kind, gentle and loving to her. Plaintiff had never seen Simon exhibit violent behavior toward anyone prior to the attack on her. (Testimony of Plaintiff).

2. On December 1, 1983, while Simon and Plaintiff Margareta B. Lindsey were alone at the house of Simon and his father, Simon attacked Plaintiff and stabbed her multiple times in the chest, breasts, abdomen and legs. (Testimony of Plaintiff; photographs). The father, Forest Neil Simon, Sr., was surprised at the attack on Lindsey by his son. *Id.* Simon was arrested by the Oklahoma City Police on December 1, 1983, for assault with a dangerous weapon with intent to kill.

3. Plaintiff incurred medical expenses in the amount of $10,117.09 as a result of the stabbing. Of this amount, Plaintiff actually paid $490.00 herself. Prucare paid the remaining amount, pursuant to a contract between Plaintiff and Prucare. (Testimony of Plaintiff; Plaintiff's Exhibit 1 through 1–N); (Undisputed Finding).[2]

4. Margareta B. Lindsey was hospitalized and underwent approximately three hours of surgery on December 1, 1983 as a result of the stabbing by Forest Neil Simon, Jr. She remained in the hospital approximately one week, after which she was released. (Testimony of Plaintiff; Plaintiff's Exhibit 30), (Undisputed Finding).

5. Margareta B. Lindsey returned to the hospital approximately one week after her release for gastrointestinal hemorrhages (Testimony of Plaintiff; Court's Exhibit 5; Plaintiff's Exhibit 30); and was released on or about the 17th day of December, 1983 to return to Germany. (Court's Exhibit 5; Testimony of Plaintiff); (Undisputed Finding).

6. Margareta B. Lindsey was hospitalized in Germany for symptoms occurring from the stabbing incident in late December 1983 or early January 1984. (Testimony of Plaintiff); (Undisputed Finding).

7. Plaintiff has incurred some permanent disability in both hands and her right leg as a result of the stabbing. (Testimony of Plaintiff; Court's Exhibits 5 and 6; Plaintiff's Exhibits 10 through 12).

### C. FOREST NEIL SIMON, JR., AND HIS TREATMENT HISTORY.

1. Forest Neil Simon, Jr. was born July 25, 1951. (Defendant's Exhibit 2, p. 11).

---

2. On January 11, 1988, pursuant to Court order, the parties submitted responses to their respective proposed findings. As reflected in the responses, many of the findings in question are not disputed. The phrase "Undisputed Finding", whenever it appears in this opinion, refers to a proposed finding which was not challenged by opposing counsel in the January 11, 1988 pleadings.

On January 25, 1971, he entered active duty in the United States Army. He was discharged under honorable conditions on February 11, 1972. (Undisputed Finding).

2. Simon was treated for his mental condition on numerous occasions by the Veterans Administration Health Care Facilities both as an inpatient and an outpatient. (Defendant's Exhibit 1A and 1E); (Undisputed Finding). Such records and testimony herein also show treatment of Simon at various times by private physicians.

3. Simon, as a 100% service-connected disabled veteran, had priority for admission to any Veterans Administration facility. (Affidavit of Stephen Terry, Court's Exhibit 11, paragraph #7); (Undisputed Finding).

4. On October 25, 1972, Simon was seen for the first time by the Oklahoma City VAMC where he was admitted and hospitalized for nine days until November 3, 1972. (Defendant's Exhibit 1A, p. 269). No follow-up treatment was found necessary. The purpose of the hospitalization was for observation, evaluation, and treatment to allow the Veterans Administration to further consider his requests for service-connected disability. (Undisputed Finding).

5. On February 24, 1975, Simon was admitted to the Oklahoma City VAMC for treatment after Simon attacked, stabbed, and attempted to rape his mother. (Court's Exhibit 1, paragraph 8; Plaintiff's Exhibit 19; Defendant's Exhibit 1A, p. 244). The treating physicians diagnosed his actions as the product of a mental illness, paranoid schizophrenic reaction. He remained in the Oklahoma City hospital until March 7, 1975 when he was transferred to the VAMC in Topeka, Kansas, where he remained until July 15, 1975. He was diagnosed schizophrenic, paranoid type. He was then released from Kansas for continuous outpatient treatment in the Oklahoma City VAMC. He attempted suicide while in the VAMC in Topeka by slashing his wrists. After stabbing his mother, Forest Neil Simon, Jr. was an inpatient in VAMC for 131 days, from March 7, 1975 until July 15, 1975. (Court's Exhibit 1, paragraph 8; Plaintiff's Exhibit 1A, p. 176). He was

discharged from Topeka with medication to return to Oklahoma City and follow-up as an outpatient at the Oklahoma City VAMC.

6. Simon was treated as an outpatient at the Oklahoma City VAMC with regular visits for group therapy, consultations and medications from July 1975 through March 1976 with his last outpatient contact during the period being March 30, 1976. (Defendant's Exhibit 1A, pp. 169–173); (Undisputed Finding).

7. On April 1, 1976, Simon was brought to the Oklahoma City Veterans Administration emergency room comatose in an ambulance after a suicide attempt by overdose of barbiturate pills. He was hospitalized as a mental patient and treated as an inpatient at the Oklahoma City VAMC on April 27, 1976. (Defendant's Exhibit 1A, p. 132); (Undisputed Finding).

8. Simon was treated as an inpatient at the Topeka Veterans Administration hospital from April 27, 1976 to August 28, 1976. He was discharged to the Oklahoma City VAMC for medication follow-up. (Defendant's Exhibit 1A, p. 71); (Undisputed Finding).

9. Simon was followed as an outpatient at the Oklahoma City VAMC regularly from September 28, 1976, through February 1978. (Defendant's Exhibit 1A, pp. 312–315); (Undisputed Finding).

10. The Oklahoma City VAMC's progress note on February 23, 1978, (Defendant's Exhibit 1A, p. 312), indicates the father of Simon called to report Simon was hearing voices telling him to be violent with certain people. This was stated to have increased in the past two weeks. "In particular, patient called his mother and told her he may have to 'do it again' (referring to stabbing her). We advised patient's father to have patient admitted." (Undisputed Finding). There is no evidence that Simon's father acted on this request.

11. On March 1, 1978, Simon again attempted suicide by overdose. He was taken to Baptist Hospital in Oklahoma City on March 3, 1978, treated as an inpatient at the Oklahoma City Veterans Administration Medical Center and discharged on

March 9, 1978, to begin private psychiatric treatment which had been arranged in advance with concurrence of the patient, his father and his grandmother. (Defendant's Exhibit 1A, pp. 6–7). On or about November 27, 1981, Simon resumed treatment at the VAMC in Oklahoma City as an outpatient. (Plaintiff's Exhibit 16A).

12. Simon was treated as an outpatient by the Oklahoma City VAMC from July 1981 to September 20, 1983. He was seen on numerous occasions by Veterans Administration Health Care professionals for consultations and medications during this period of outpatient treatment. (Defendant's Exhibit 1A, pp. 293–307, and 1D). He was also a patient at the Veterans Administration Medical Center in Brentwood, California, during this time period [from March 5–25, 1982], and was declared incompetent for Veterans Administration purposes effective July 16, 1982.

13. During this period of outpatient treatment at Oklahoma City VAMC, he was examined and treated at least nine times by Dr. Murali R. Krishna, staff psychiatrist. Dr. Krishna was thoroughly familiar with Simon's history, diagnosis and mental health problems, although Krishna never requested the Brentwood records which normally would be done. (Defendant's Exhibit 1A, pp. 293–301; Trial Transcript of Dr. Krishna, pp. 7–10; Testimony and Affidavit of Stephen Terry).

14. The Oklahoma City Veterans Administration Mental Hygiene Clinic had no control over the outpatient Simon. Taking medications and making visits to the clinic were the duty of the outpatient Simon and his family. (Trial Transcript of Dr. Krishna, pp. 12–13). Dr. Krishna saw Simon approximately once a month in 1982, but because Simon did not want to come on a monthly basis, Dr. Krishna extended evaluation to once every three months. While other medical experts suggested that Simon should have been seen more often, the Court does not find that Dr. Krishna's treatment fell below any recognized medically accepted standards involving patients such as Simon.

15. While Simon's chronic paranoid schizophrenic illness caused him to have many hallucinations and hear voices, there was no suicidal or homicidal ideation indicated during the eighteen months of care with Dr. Krishna. (Defendant's Exhibit 1A, pp. 293–301). However, predictions as to suicidal or homicidal tendencies are extremely difficult to make with respect to patients such as Simon.

16. Simon's last recorded outpatient visit to the Oklahoma City Veterans Administration Mental Hygiene Clinic before his attack on Plaintiff was September 20, 1983. Dr. Krishna's progress note on that date indicates Simon continued to have a significant amount of paranoid ideation, but he was aware of reality. Simon admitted he hadn't been taking his medication properly. Dr. Krishna noted that Simon had thought and perceptual disturbance, but "no active suicidal or homicidal ideation". Medications were prescribed accordingly. (Defendant's Exhibit 1A, p. 293). At the time of the attack, Simon was a voluntary outpatient at the Oklahoma City Veterans Administration Medical Center and was residing with his father and guardian, Forest Simon, Sr., a practicing attorney, at 3601 N.W. 52nd Street, Oklahoma City, Oklahoma. (Testimony of Plaintiff).

D. MEDICAL RECORDS.

The record keeping and retrieval procedures of the Veterans Administration, as reflected by the record evidence in this case, are extremely poor. Despite repeated written and oral requests of the United States Attorney's Office, the Veterans Administration failed to produce numerous medical records of Forest Neil Simon, Jr. for the trial of this case in a timely fashion. Instead, many important records were not discovered until the eve of trial. The record as a whole establishes that the Veterans Administration was negligent or incompetent in its record keeping procedures in this case. At least two outpatient visits, dated November 4, 1981, and July 28, 1981, are unaccounted for. (Defendant's Exhibit 1D, and Proposed Finding # 12). Also, while the evidence indicates that Simon went to the VAMC in Oklahoma City ap-

proximately one week prior to the stabbing of Plaintiff, the Veterans Administration has no records reflecting any visit by Simon to the Hospital after September 1, 1983. (Lindsey Exhibit 15A, 16C). Also, as acknowledged by Dr. Krishna, Plaintiff's Exhibit 13-A, which was provided to Plaintiff by the Veterans Administration as a summary of Simon's VAMC records in Oklahoma City, is inaccurate and misleading in several respects. Other examples of problems include the following:

1. On April 1, 1982, the VAMC records for Oklahoma City reflect that the patient had been previously seen by Dr. Krishna, but there are no previous records reflecting this. (Plaintiff's Exhibit # 16-A; Testimony of Dr. Krishna; Court's Exhibit 9, TR-70-71, lines 12 through 25 and 1 through 16).

2. On numerous occasions beginning approximately July 15, 1977, the VAMC medical records reflect that the patient's records were not available. (Plaintiff's Exhibit 16-1, 16-C, 17-A).

3. On April 12, 1982, the medical records of Forest Neil Simon, Jr., reflect that Simon told the doctor he had taken some of his own medical records. (Plaintiff's Exhibit 16-A).

4. The doctors treating Forest Neil Simon, Jr. did not always make notations of telephone conversations with patient's family. (Court's Exhibit 9, TR-71, lines 21-25, TR-72, lines 1-17; testimony of Dr. Robertson).

5. Moreover, the Court received expert testimony that a Veterans Administration Medical Center which is treating a patient who has been treated at another Veterans Administration Medical Center should request the patient's records from the Veterans Administration Medical Center where the patient was previously treated. This was not done in this case. (Testimony of Stephen L. Terry; Dr. Marder; Dr. Krishna).

As a result, except for those areas where the parties agree that certain events occurred or that certain facts may be stipulated, the Court has very little confidence in the Veterans Administration records in this case.

**E. KAY HARRIS.**

1. On or about November 27, 1983, Simon pointed a loaded gun at Kay Harris and pulled the trigger several times. (Court's Exhibit 2). The gun did not fire because the clip was improperly placed in the gun. Simon had a poor relationship with Harris and did not like her. (Plaintiff's testimony; Affidavit of Kay Harris).

2. Unlike the attack on Plaintiff, which was reported to the police and resulted in Simon's arrest, the police were never notified by Ms. Harris or by Simon's father of this assault and no police report could be produced for trial. (Testimony of Kay Rakestraw Harris). Indeed, even after Plaintiff Lindsey was stabbed, Simon's father, by sworn statement, participated in the commitment proceedings and related under oath *only* Simon's suicide attempts, the stabbing of his mother and the attack on the Plaintiff as indicative of Simon's danger to himself and others. He did not relate the Kay Rakestraw Harris assault. (Defendant's Exhibit 2, p. 10); (Undisputed Finding).

3. Each day after the assault on Kay Harris, Simon was allowed to stay alone at his father's home despite the presence of guns and ammunition. (Plaintiff's testimony).

4. Plaintiff was well aware of the assault on Harris, yet she visited the home alone on four successive days following the assault on Harris. (Plaintiff's testimony).

5. Some notice of the Harris assault was received by unidentified individuals at the Veterans Administration in or about the period November 28, 1983 through November 30, 1983. (Undisputed Finding); (*See* further discussion of this "notice" and the Veterans Administration response in Section F, *infra*).

**F. DUTY—STANDARD OF CARE.**

1. In connection with the action the Veterans Administration should have taken in response to the calls relating to the Harris incident, the standard of care in

the field of psychotherapy under the circumstances of this case is to advise the individual and/or his family to have the patient promptly brought in for observation, if the hospital is aware that the patient has recently made a homicidal attempt and has a known history of dangerous propensities. (Dr. Krishna, at 35–38; Dr. Smith at 6–7). If the family was unwilling or unable to bring the patient in, the Veterans Administration could take steps to initiate commitment proceedings if warranted under the circumstances. (Dr. Krishna at 35–38; Court's Exhibit 7, Court's Exhibit 8, at 73, 96; Dr. Smith's trial testimony at 16). To take no action or to ignore such information under these circumstances would be negligent as recognized by even Veterans Administration officials. (Dr. Smith at 86–87). When the danger is not immediate, the family should be advised of their options for procuring assistance. (Dr. Krishna; Dr. Smith). The Veterans Administration, however, clearly has no authority to "go over to that person's house and pick him up and bring him [to the Veterans Administration]." (Dr. Krishna at 39; Dr. Smith).

2. A prior historical incident similar to the fact situation herein recorded, occurred on February 23, 1978. On February 23, 1978, when presented with a telephone call by Forest Simon, Sr., detailing exigent circumstances, Veterans Administration personnel instructed the father to bring his son in for evaluation. (Defendant's Exhibit 1A, p. 312).

3. It is within the ordinary standard of care and sound psychiatric practice to emphasize outpatient therapy rather than lengthy custody and supervision. (Court's Exhibit 12).

4. Medical treatment of a psychiatric patient must take into consideration the uncertainty which accompanies psychiatric analysis. (Court's Exhibit 12).

5. The "open door" approach is the acceptable medical standard of psychiatric practice. (Court's Exhibit 12).

6. In deciding the extent to which a mental health patient should be given less restrictions, the treating physician must exercise his judgment and balance the various therapeutic considerations together with the possible danger. (Court's Exhibit 12).

7. It is undisputed by Plaintiff that Simon was passive for a substantial period of time after the Harris incident but prior to the attack on the Plaintiff; that Simon was permitted to be left alone with Plaintiff in a house containing weapons during this time period; that the Harris incident was not deemed serious enough to report to the police; and that the attack on Plaintiff was a surprise to both Plaintiff and Simon's father.

8. Simon, as an outpatient, could not be admitted by Defendant's agents as an inpatient for mental health disorders without voluntary request of Simon or his guardian, or clear and convincing evidence presented to the Veterans Administration agent sufficient to satisfy Oklahoma law of involuntary commitment. (Dr. Krishna, Dr. Smith). Thus, Defendant was not negligent in its failure to admit, restrain, confine or seek judicial commitment of Simon prior to the attack on Plaintiff. A further discussion of these findings appears below.

As acknowledged by Plaintiff's counsel in final arguments, central to the Plaintiff's theory of recovery is Simon's attack on Kay Harris in November, 1983. Plaintiff's counsel contended that but for this attack, Plaintiff had no case against the Veterans Administration since, according to plaintiff's counsel (1) Simon's stabbing of Plaintiff was not foreseeable prior to this incident, and (2) the Veterans Administration had no duty to admit Simon or warn Plaintiff in light of Simon's history *prior* to the Kay Harris incident. As a result, the Veterans Administration's knowledge, as well as the Veterans Administration's response to any alleged knowledge of the Harris incident, is critical to Plaintiff's theory of the case.

Plaintiff sought to prove that after the Harris attack, and prior to the attack on Plaintiff, Simon's father sought on numerous occasions to have his son admitted to

the VAMC. Due to the death of both Simon and his father prior to trial, this proof was sought to be adduced through two witnesses, Vivian Bragg and Bill Davidson. As reflected by the affidavit of Vivian Bragg and her trial testimony, Bragg's testimony was primarily hearsay in nature and substantial portions of it were stricken. In fact, contrary to the prior indications by Plaintiff's counsel, the portions of Bragg's affidavit setting forth purported conversations with Veterans Administration employees were in reality information she received from Simon's father about such conversations prior to his death.

Like Bragg's testimony, Davidson's testimony was also conclusory rather than fact-intensive. Although his affidavit stated that the Veterans Administration had refused on two separate occasions to admit Simon, upon further inquiry by the Court, it was determined that Davidson had little personal knowledge of these incidents and that both of these alleged incidents were not related to the Kay Harris incident, or even sufficiently close in time to make them relevant to this Court's determination. (See Court's Exhibits 3 and 4; trial testimony of Bragg, Davidson). In short, Plaintiff's case suffered greatly by not having Simon's father available as a witness.

While some notice of the Harris assault was apparently received by someone at the Veterans Administration from Forest Simon, Sr. by telephone sometime between November 28th and December 1st, 1983, (Court's Exhibit 3), there is no persuasive evidence relating to who was contacted, their knowledge or responsibility for Simon's case, their advice if any to Simon's father, or any of the details of the alleged conversation. None of the Veterans Administration witnesses in this case were aware of any such call. More importantly, there is no credible evidence as to the substance of any statements made by employees of the Veterans Administration to Simon's father concerning advice given to the father during the period between the Kay Harris incident and the stabbing of Plaintiff. The Veterans Administration's alleged response, of course, is critical to a determination of whether the Veterans Administration or its employees acted in conformance with recognized acceptable medical practice. Indeed, this gap in Plaintiff's case was admitted by Plaintiff's counsel in closing argument.

In short, the testimony of Bragg and Davidson was lacking in many important details and was unpersuasive to the Court. Given (1) the absence of evidence concerning advice given by an identifiable Veterans Administration representative, (2) the testimony of V.A. medical experts concerning the advice which would normally be given under such circumstances, and (3) Simon's father's previous refusal to follow similar advice from the V.A., the Court is compelled to find that Plaintiff has failed to establish a breach of any recognized duty or standard by the Veterans Administration.

It should be noted that while the government urged the Court to question the Bragg/Davidson testimony on the grounds that there were no medical records corroborating such contacts, this inference is rejected due to the Veterans Administration's record keeping and retrieval procedures in this case. While in most cases this would be an entirely appropriate inference, the Court cannot make such a finding in this case. Rather, based on the evidence which was introduced, the Court concludes that Plaintiff has failed to establish by a preponderance of the evidence that the Veterans Administration breached the acceptable standard of care for diagnosis and treatment.

## G. PROXIMATE CAUSE/ASSUMPTION OF RISK.

1. It is impossible to predict future behavior in paranoid schizophrenics because their behavior may completely change in a matter of minutes. (Testimony of Dr. Krishna; Plaintiff's Proposed Finding # 30).

2. Forest Simon, Sr., allegedly a person who knew the tendencies of his son well, was surprised at the attack on Plaintiff. Plaintiff testified that she was also sur-

prised. Likewise, the attack by Simon on Plaintiff was not foreseeable by Defendant. (Plaintiff's testimony; Dr. Krishna's testimony; Court's Exhibit 10, at 52, 56).

3. Plaintiff had an excellent relationship with Simon. Simon was gentle and loving toward her and she had no reason to be afraid of him prior to December 1, 1983. (Plaintiff's testimony).

4. Medical testimony indicates that the attack on Harris, an individual Simon did not like, was not necessarily predictive of an attack on Plaintiff, with whom he had a loving relationship. (Dr. Krishna, however, was not aware of the Harris incident prior to the stabbing of Plaintiff.)

5. Plaintiff assumed the risk for her injuries herein by not staying away from Simon when she knew of his attack on Harris and the prior attack on his mother.

6. The Court finds by a preponderance of the evidence that Defendant was not negligent in its examination, diagnosis, treatment or care of Simon prior to December 1, 1983, and is not liable for the injuries to Plaintiff.

## IV. ADDITIONAL CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1346(b).

2. 28 U.S.C. § 1346(b) provides the United States may be civilly liable to the same extent as private persons for personal injuries caused by the negligent acts of its employees acting within the scope of their employment.

3. This jurisdictional provision is also a choice-of-law provision which directs this Court to apply the law of the place where the act or omission occurred.

4. Here there is no question that Oklahoma law applies.

5. In Oklahoma, the standard of treatment and care for hospitals treating outpatients are different than those for inpatients. It is obvious that the Defendant could not exercise the degree of control over Simon while he was an outpatient that it could if he were an inpatient. *Runyon v. Reid*, 510 P.2d 943, 950 (Okla.1973).

6. In Oklahoma, a medical specialist owes a duty of care required of those similarly engaged in the practice measured by national standards. 76 O.S.Supp.1987, § 20.1.

7. The standard of care owed a patient by a treating hospital must take into consideration the uncertainty which accompanies psychiatric analysis. *Voss v. United States*, 423 F.Supp. 751 (E.D.Mo. 1976).

8. Oklahoma law ordinarily requires in a medical malpractice action that Plaintiff establish the alleged malpractice by the testimony of a qualified medical expert. *Joplin v. United States*, 441 F.Supp. 1142, 1143 (E.D.Okla.1977), citing *Boxberger v. Martin*, 552 P.2d 370 (Okla. 1976).

9. The facts in this case do not present the kind of evidence as would be required for an Emergency Order of Detention or involuntary commitment as provided by State law. 43A O.S.Supp.1987, § 5–205. Indeed, the Harris incident was deemed of sufficiently minor importance that it was not reported to the police by the victim or Simon's family.

10. The Court is unable to find a duty of the Veterans Administration to admit Simon prior to the attack on Plaintiff under the facts of this case, involving at best telephone calls made to unidentified individuals at the Veterans Administration Medical Center alleging a recent violent act by a patient. Moreover, this Court is unwilling to impose upon those in the psychotherapy profession an ill-defined "duty to control" which would require them to be ultimately responsible for the acts of the outpatients. *Brady v. Hopper*, 570 F.Supp. 1333, 1339 (D.C.Colo.1983).

11. The Court concludes as a matter of law that the evidence is insufficient to establish a legally recognized duty of the Veterans Administration to independently undertake action to insure the compulsory presentment of Simon for examination. *See Hasenei v. United States*, 541 F.Supp.

999, 1009 (D.C.Md.1982). Here, the Defendant had no ability to control the conduct of its outpatient. *Id.*

12. The evidence fails to establish a causal link between the alleged failure to admit Simon following his attack on Kay Harris on November 27, 1983 and the assault on Plaintiff on December 1, 1983.

13. It is fundamental that before a defendant may be held liable for a person's injury to another, the injury complained of must have been reasonably foreseeable by the Defendant. *Bradford Securities v. Plaza Bank and Trust,* 653 P.2d 188 (Okla. 1982); *Brady v. Hopper,* 570 F.Supp. 1333 (D.C.Colo.1983), *aff'd* 751 F.2d 329 (10th Cir.1984). For the reasons set forth previously in this opinion, the injuries of Plaintiff were neither directly nor proximately caused by Defendant.

■ 14. Plaintiff also attempted to recover in this case on the theory of negligent failure to maintain adequate medical records. The government asserts that the Court lacks jurisdiction to consider this claim since no administrative claim was submitted by Plaintiff on that issue. This Court concludes that even if it has jurisdiction to hear Plaintiff's alleged issue of negligent maintenance of medical records, Plaintiff has failed to substantiate this action. Plaintiff's injuries were neither directly nor proximately caused by the Veterans Administration's record keeping procedures. However, to the extent the Veterans Administration's record keeping procedures resulted in the belated production of documents previously requested by Plaintiff's counsel, this failure to comply with the scheduling order of this Court is an appropriate basis for the imposition of sanctions under Rule 16(f).

## V. SANCTIONS AGAINST THE GOVERNMENT

■ In managing and controlling its ever-increasing caseload, the Court has the inherent and statutory power to sanction the defaulting party or an attorney. *Link v. Wabash Railroad Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *In re Baker,* 744 F.2d 1438, 1442 (10th Cir.1984).

In exercising this power, the Court has the authority to enforce its orders with a view to promptly processing and adjudicating its lawsuits. *Stanley v. Continental Oil Co.,* 536 F.2d 914 (10th Cir.1976).

■ With regard to scheduling orders and trial preparation, the Court also has broad discretion in fashioning appropriate sanctions under Rule 16(f) for failure to comply with the pretrial orders of this Court. *American Medical Systems v. Picker International,* No. 85–1619, slip op. (10th Cir. March 30, 1987); *Albert O. Roy v. American Professional Marketing, Inc.* 117 F.R.D. 687 (W.D.Okla.1987). As the Tenth Circuit stated in *Baker:*

> [T]here can be no doubt that subsection (f), added as part of the 1983 amendments to Rule 16, indicates the intent to give courts very broad discretion to use sanctions where necessary to insure not only that lawyers and parties refrain from contumacious behavior, already punishable under the various other rules and statutes, but that they fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial. [744 F.2d at 1440.]

The *Baker* Court went on to state that the primary purpose for sanctions in the Rule 16 context is to insure reasonable management requirements for case preparation, with the compensation of adversely affected parties serving only a secondary purpose for the imposition of sanctions. *Id.* at 1441.

In this case, a scheduling order was entered on August 26, 1986 by Chief Judge Eubanks, and one extension of these deadlines was granted by the Court on March 6, 1987. The final scheduling order required discovery to be completed by July 17, with the final pretrial order to be submitted on July 31, 1987.

The case was transferred to the docket of this Court in June, 1987, and placed on the Court's October, 1987 trial docket. As noted previously, the trial had to be moved to November, 1987, due to the belated production of the records by the government.

After hearing the testimony of witnesses, the arguments of counsel, and reviewing the affidavits of several witnesses relating to the medical records in question, the record is uncontroverted that more than three months *after* the discovery deadline had passed, and more than two months after the filing of the final pre-trial order, the government produced dozens of medical records which were relevant to the trial of this matter. The records then had to be reviewed by experts on both sides, which injected new evidence and new issues into the trial of this matter, and which imposed a hardship on both opposing counsel and the Court.[3]

Further, the Court has carefully reviewed, and flatly rejected the government's recent efforts to disavow any agreement with Plaintiff's counsel to produce the medical records. The record in this case establishes (1) Plaintiff's counsel's efforts and desire to obtain the records, (2) an agreement by the government to produce them and (3) a failure to produce the required documents. The government's belated claim that it was merely seeking the records for its own trial preparation purposes is contradicted by the October 20, 1987 hearing and the credible affidavits and exhibits submitted by Plaintiff's counsel. The government's position, in contrast, has shifted throughout these proceedings and its credibility has been impaired.

Specifically, the Court finds that there was a discovery agreement with Plaintiff's counsel to produce the records in question. Having found the existence of an agreement, the Court finds the government's failure to produce the records until the eve of trial, more than three months after the discovery cutoff date, as well as its failure to adequately prepare this case for trial constitutes a violation of Rule 16 of the Federal Rules of Civil Procedure.

The failure to produce the documents in a timely fashion resulted in Plaintiff's counsel having to request a continuance of the trial, a two week delay of the trial itself, and a waste of the Court's and opposing counsel's time with respect to the hearings devoted to the belatedly produced documents, not to mention the substantial amount of time at trial devoted to the issue. The untimely production of documents also rendered useless other filings called for by the scheduling order which were prepared without the benefit of the documents produced on the eve of trial. *See, e.g.*, Final Contentions of Plaintiff, filed June 1, 1987; Final Contentions of Defendant, filed June 11, 1987; Final Pretrial Order, filed August 5, 1987. In this case, Plaintiff's counsel were entitled to review the medical records which they requested in a timely fashion. The negligent or incompetent search for these documents resulted in the documents not being produced until the eve of trial, thus working a hardship on both the Court and opposing counsel.

For failure to obey a scheduling order, Rule 16(f) specifically authorizes sanctions as set forth in Rule 37, as well as the imposition of "the reasonable expenses incurred because of any noncompliance with this Rule, including attorney's fees, unless the Judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust." Rule 16(f), Fed.R.Civ.P. Here the Court finds that the government's failure to complete discovery in a timely fashion was not justified, particularly in light of the fact that the documents in question were reviewed by Veterans Administration officials in 1985 at the request

---

3. Unfortunately, the untimely filing of documents or pleadings by the government is not an uncommon occurrence in this district. *See, e.g., U.S. v. Vap,* CR–86–266–W (Order dated March 23, 1987) (untimely production of *Brady* materials) [available on WESTLAW, 1987 WL 48845]; *U.S. v. Newman, et al.,* CR–87–207–A (Order dated October 26, 1987) (untimely production of discovery materials resulting in delay of trial); *U.S. v. Ken Mar,* —— F.Supp. ——,

CIV–83–1805–P (Order dated October 27, 1987) (untimely filing of motion to dismiss); *Stirs v. T.C. Martin,* —— F.Supp. ——, CIV–86–1615–A (Order dated September 16, 1986) (failure to timely respond to habeas corpus resulting in release of prisoner). *Ward v. Bowen,* —— F.Supp. ——, CIV–85–343–C (Order dated January 22, 1988) (failure to respond to motion for attorney fees resulting in award of fees under Equal Access to Justice Act).

of the Assistant United States Attorney Griffith, but were not produced to government counsel or Plaintiff's counsel until October 1987. (*See* Testimony of Stephen L. Terry and Affidavit). Moreover, the Court finds the award of expenses to be justified.

Based on the hardship imposed on the Court and opposing counsel in this matter as a result of the government's failure to produce requested discovery documents in a timely fashion in violation of Rule 16(f) of the Federal Rules of Civil Procedure, it is HEREBY ORDERED AS FOLLOWS:

THE UNITED STATES OF AMERICA WILL PAY $4,500 TO PLAINTIFF'S COUNSEL MARK ORUCH, AND $5,500 TO PLAINTIFF'S COUNSEL REBECCA K. SCHNEIDER, WHICH PAYMENTS REPRESENT THE REASONABLE ATTORNEY FEES ASSOCIATED WITH THE UNTIMELY PRODUCTION OF THE REQUESTED DISCOVERY MATERIALS. THE SOURCE OF THE FUNDS USED TO PAY THIS SANCTION IS TO BE DETERMINED BY THE INDIVIDUALS RESPONSIBLE FOR THE SUPERVISION OF THIS LITIGATION. THE $10,000 SANCTION IS TO BE PAID WITHIN THIRTY (30) DAYS OF THE DATE OF THIS ORDER.

The Court reached the determination of the amount of the sanction by entering an Order on December 22, 1987, requiring Plaintiff's counsel to submit affidavits detailing the time spent on this case after October 15, 1987, which could be directly attributed to the untimely production of documents. Plaintiff's counsel complied with the Order on January 11, 1988 and on January 22, 1988, the government filed its objection to the reasonableness and appropriateness of the contemplated sanction. By requiring the payment of $10,000 in attorney fees to Plaintiff's counsel, the Court has sustained in part the government's objection to the reasonableness of the fees, reducing Plaintiff's requested fees by almost 50%.

While the Court agrees that a portion of the time attributed by plaintiff's counsel to the late production of medical records overlapped in part with normal trial preparation, the circumstances surrounding the government's untimely production of the records have made it difficult, if not impossible, to be precise in identifying sanctionable attorney time versus nonsanctionable attorney time. In this case, the two are so inextricably intertwined after October 15, 1987 as to preclude mathematical precision. This does not mean, however, as the government suggests, that no fees should be permitted. Indeed, given the fact that the government was the direct cause of the hardship placed on both the Court and opposing counsel, the Court could have easily exercised its discretion to permit a larger recovery. Instead, the Court has opted for a more moderate course.

The Court, however, is squarely rejecting the government's contention, contained in its filing of January 22, 1988, that no recovery should be permitted in light of certain concessions made by Plaintiff's counsel in closing argument. As the government accurately points out, and as this Court observed in section F of the findings *supra*, Plaintiff's counsel conceded in closing argument, *after* reviewing *all* of the evidence in the case, that no case existed against the government prior to the attack on Kay Harris. Relying on this concession, the government, after acknowledging its "mistakes" relating to the witheld records, claims that no recovery of costs or fees should be permitted since virtually all of the medical records in question predate the Harris incident. *See* Defendant's objections filed January 22, 1988 at 6–7 and Exhibits 16 through 24, all of which were untimely produced.

The problem with this analysis is obvious. Reduced to its simplest terms, this argument in essence states: "We realize we made a mistake; we are sorry for the imposition on the Court and counsel; but the records didn't help you in the final analysis." As pointed out previously, the records were indisputably relevant to this proceeding. The history of the Veterans Administration's treatment of Simon, coupled with the Veterans Administration's knowledge of his violent propensities, was

an integral part of the lawsuit. Indeed, the Court relied on the withheld records in fashioning a number of its findings. Plaintiff's counsel's candid concessions in closing arguments made at the *end* of the case and after a careful review of *all* evidence, do *not* mean that plaintiff was not entitled to review the documents in the first place. Moreover, the argument advanced by the government is at odds with the high standards expected from litigation counsel for the United States.

As pointed out by Justice Sutherland in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; ... As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones."

Although the Supreme Court's comments were made in the context of a criminal prosecution, these principles apply equally to government counsel in civil matters. While the missing records ultimately did not turn the tide in Plaintiff's favor, the government should not be able to use this fact as both a sword and a shield. In short, the records were clearly necessary to the parties' and the Court's search for the truth. Unfortunately, as established by the affidavit and testimony of Stephen L. Terry, the bulk of the withheld records were available in Oklahoma City as early as 1985, but not produced until the weekend before trial in December 1987. Such a delay is inexcusable.

This Court finds distasteful the task of sanctioning parties and counsel to litigation. Indeed, this Court has rarely and reluctantly imposed monetary sanctions against parties for inadequate preparation and failure to comply with scheduling orders and discovery requests under Rule 16. *See* Orders Imposing Sanctions, *Albert O. Roy v. American Professional Marketing, Inc.*, 117 F.R.D. 687 (W.D.Okla.1987); *Roberts v. McCrory*, 693 F.Supp. 998 (W.D. Okla.1987). However, as the Tenth Circuit in *Baker* stated in its *en banc* opinion:

> [W]e are dealing with the matter most critical to the court itself: management of its docket and avoidance of unnecessary burdens on the tax-supported courts, opposing parties or both. [744 F.2d at 1441].

Echoing the words of the Tenth Circuit in *Baker*, orders such as this will serve as an appropriate sanction message to the party involved and to the bar generally. *Id.*[4]

During the litigation, the Court stated that it would consider imposing cost sanctions against defense counsel for failing to timely produce the documents in question. While the Court is troubled by government counsel's shifting positions on the issue of whether there was an agreement with Plaintiff's counsel to produce the records in question, there is no doubt that Mr. Griffith made oral and written requests to have the Veterans Administration produce all of Simon's medical records. Accordingly, sanctions against counsel are inappropriate.

## VI. CONCLUSION

For the above stated reasons, the Court rules against Plaintiff on the issue of liability and orders the government to pay the sanctions called for by the terms of this Order within thirty (30) days. Judgment

---

**4.** As this Court did in the case of *Roberts v. McCrory*, 693 F.Supp. 998 (W.D.Okla.1987), the Court could have required additional sanctions to be paid to the clerk of the court due to the hardship imposed on the Court as a result of Defendant's conduct. *See Robinson v. Moses*, 644 F.Supp. 975 (N.D. Ind. 1986). In light of the fact that the sanctioned party would be the United States, the Court felt that a sanction which merely resulted in a transfer of funds from one branch of the government to another would be fruitless. Accordingly, the Court has based its sanction solely on the hardship imposed on Plaintiff's counsel, recognizing that this sanction does not portray the complete picture of the harm caused by the government's failure to timely produce the records in question.

on the merits is hereby entered in favor of Defendant and the case is DISMISSED in its entirety.